**COMMONWEALTH ASSOCIATES,**
**Petitioner,**

v.

**James N. LETSOS, III, Respondent.**

**No. 98 Civ. 4753 LAK.**

United States District Court,
S.D. New York.

March 12, 1999.

Harry L. Garman, P.A., Verona, NJ, for petitioner.

Paul D. Flack, Houston, TX, for respondent.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Respondent James M. Letsos, III, was a retail stock brokerage customer of an account executive named Guy Clemente, who was employed by petitioner Commonwealth Associates ("Commonwealth"). In November 1996, he commenced an NASD arbitration against Clemente and Commonwealth, claiming that he sustained over $100,000 in damages as a result of Clemente's unauthorized purchases in Letsos' account and his failure to execute Letsos' sell orders and that his losses were the product also of Commonwealth's failure to supervise Clemente. He sought both actual and punitive damages against both.

An NASD arbitration panel conducted one prehearing session and a four day hearing in Houston, Texas, in 1998. On May 28, 1998, it rendered a unanimous award for Letsos, holding Clemente and Commonwealth jointly and severally liable for $75,000 in actual damages and holding each liable for $45,000 in punitive damages.

Commonwealth has petitioned this Court, pursuant to the Federal Arbitration Act,[1] to vacate the award against it, claiming that the arbitrators acted in manifest disregard of law and that the punitive damage award violated the Due Process Clause.[2] Letsos in turn has moved to enter judgment on the award and for Rule 11 sanctions against Commonwealth.

*The Record*

Before considering the contentions of the parties, it is important deficiencies of the record before the Court.

The arbitration hearing was tape recorded rather than taken down by a shorthand reporter. The tapes are not before the Court and, it appears, not entirely in the possession of the parties. In any case, neither side has had them transcribed by a certified reporter. The only "transcripts" in the record are transcriptions of tapes of Letsos' testimony made by secretaries for the opposing lawyers, and neither of those is certified as accurate[3] or complete. Petitioner's transcript admittedly omits "statements between and among the Arbitration Panel and the attorneys pursuant to objections and other matters" while respondent's version avowedly is only an excerpt from Letsos' testimony.[4] It appears from other materials submitted that Clemente also testified,[5] but the parties have not submitted any transcript of his testimony. Nor does the record before the Court indicate what, if any, other witnesses testified in the hearing or the substance of their testimony.

The situation is equally deficient with respect to exhibits before the arbitration panel. Letsos' counsel has submitted 19

---

1. 9 U.S.C. § 1 *et seq.*

2. Jurisdiction is based on diversity of citizenship. Although the petition did not contain adequate jurisdictional allegations, the Court conducted a conference call with counsel in which petitioner asserted that it is a partnership all of the members of which are citizens of states other than Texas and that Letsos is a citizen of Texas. In consequence, with the consent of the respondent, the Court granted petitioner's oral motion to deem the petition amended to make the requisite jurisdictional allegations. Tr., Mar. 8, 1999; *see* 28 U.S.C. § 1653.

3. Counsel state that they believe that they are accurate but there is no suggestion that counsel listened to the tapes and compared them with the transcripts.

4. Flack Aff. ¶ 4; Garman Reply Aff. ¶ 3.

5. Flack Aff. ¶ 14(m).

exhibits that, he says, were presented to the arbitrators. He does not say that these 19 were the only exhibits presented. He acknowledges, moreover, that some of the 19 were not received in evidence at the hearing and states that the absence of a hearing transcript makes it impossible to determine which were received and which were not.[6] Commonwealth's counsel, for his part, claims that Exhibits 5 through 7 and 19 to the affidavit of respondent's counsel in this Court (which, he says, were marked Exhibits 17, 28, 13 and 14, respectively, in the arbitration hearing) were excluded by the arbitrators, thus implying that the other 15 exhibits submitted to this Court by Letsos were received by the arbitrators. But Commonwealth's counsel maintains that there were other, unspecified exhibits received in evidence in the arbitration hearing.[7]

### The Attack on the Award

 As an initial matter, a party moving to vacate an arbitration award faces a high threshold.[8] Arbitration awards generally are accorded great deference.[9] Judicial review of arbitration awards necessarily is narrowly limited in order to avoid "undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."[10] The burden of establishing grounds to vacate an award is on the party asserting its invalidity.[11] In order to overturn an award on the basis of manifest disregard of law, moreover, one must show "more than error or misunderstanding with respect to the law."[12] Instead,

> "[t]he error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing principle but decides to ignore or pay no attention to it."[13]

### Actual Damages

Commonwealth first attacks the award of $75,000 in actual damages as having been rendered in manifest disregard of law. It contends that the arbitrators improperly rejected its defenses of waiver, estoppel, ratification and alleged failure to mitigate damages and erred in computing damages. In consequence, it is necessary to piece together whatever can be gleaned from the meager record concerning the nature of Letsos' claim and Commonwealth's defenses.

Letsos' Statement of Claim alleged in pertinent part the following:

(a) Clemente knowingly made material misrepresentations and omissions of

**6.** *Id.* ¶ 5.

**7.** *See* Garman Reply Aff. ¶ 5 & Ex. B.
Exhibit B to Mr. Garman's reply affidavit purports to show that either 21 or 22 exhibits were received in evidence before the arbitrators. As Letsos' counsel has submitted a total of 19 exhibits to the Court—and he concedes that some were excluded while Commonwealth claims that 4 of the 19 were excluded—it seems clear that documentary evidence was received by the arbitrators that is not before this Court. Indeed, the papers here do not even hint at the nature of those materials.

**8.** *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997).

**9.** *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 19 (2d Cir.1997) (citing *Ethyl Corp. v. United Steelworkers of America, AFL—CIO—CLC*, 768 F.2d 180, 183 (7th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986)).

**10.** *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 695, 139 L.Ed.2d 639 (1998).

**11.** *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 12.

**12.** *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986).

**13.** *Id.* at 933; *see also Branigan v. Alex. Brown & Sons, Inc.*, 978 F.Supp. 547 (S.D.N.Y.1997).

an unspecified nature to induce him to purchase unspecified stocks.[14]

(b) Clemente, after moving from Smith Barney to Commonwealth, violated Letsos' instructions by transferring more of Letsos' funds from Smith Barney to Commonwealth than Letsos had authorized.[15]

(c) Clemente continued to purchase stocks for Letsos without authorization and in violation of Letsos' instructions including shares of ORTEL and HAPY, both of which declined in value.[16]

(d) Clemente disregarded Letsos' instructions to sell shares purchased, with Letsos' consent, in three initial public offerings. The stocks all declined after Clemente did so causing an alleged loss of $13,000 to $27,750.[17]

(e) In November 1995, Clemente delayed 9 days in carrying out Letsos' instructions to liquidate his entire account save two specified stocks.[18]

(f) When Letsos complained to Clemente's superior at Commonwealth, Mark Siegel, Siegel told him to work things out with Clemente so that Clemente would not get into trouble.[19]

Moreover, the Statement of Claim made abundantly clear that the specific transactions and incidents it recounted were "just a few examples of the misrepresentations and wrongful conduct of Clemente and his employers" for which relief was sought.[20] The Statement claimed losses "well in excess of $100,000."[21]

There is some detail to be gleaned from the record beyond the statement of claim. Commonwealth asserts, and Letsos appears to agree, that damage calculations submitted by Letsos in the arbitration are attached to the affidavit of Commonwealth's counsel as Exhibit 8. The approach taken was to begin with the total cash investment made by Letsos into each of his two Commonwealth accounts, to subtract cash and securities withdrawals, and to add the additional loss allegedly incurred by virtue of the decline in the value of the HAPY shares between the time Clemente was told to sell the HAPY shares and the date, following Clemente's failure to do so, when Letsos transferred the shares out of his account. This supposedly yielded the total loss on the accounts. Letsos then claimed that he was entitled to recover also the amount he would have earned if he had invested the amount of the loss in the Standard & Poors 500 from November 30, 1995 to the date of the hearing as well as legal and expert witness fees and expenses. In summary, Letsos claimed account losses totaling $70,839, losses attributable to the inability to invest the losses in other investments of $87,799, and legal and expert fees and expenses of $23,275.73 for a total of $181,913.73.[22] Nor was this the only damage evidence that appears to have been before the arbitrators.

It appears that Letsos finally wrote to a compliance officer at Commonwealth in January 1996 and detailed his claims.[23] He there claimed a loss of $17,880 on two stocks, ORTEL and HAPY, which Clemente allegedly purchased without Letsos' authority; a loss of $27,750 from Clem-

14. Garman Aff.Ex. 2, ¶ 22.

15. *Id.* ¶ 11.

16. *Id.* ¶ 12.

17. *Id.* ¶ 13; Flack Aff.Ex. 16 (Letsos ltr. to Campenelle, 1/17/96, at 3).

18. Garman Aff.Ex. 2, ¶ 15.

19. *Id.* ¶ 16.

20. *Id.* ¶ 17.

21. *Id.*

22. There appears to be a $100 arithmetic error on the damage exhibit.

23. Flack Aff.Ex. 16 (Letsos ltr. to Campanelle, 1/17/96).

ente's disregard of his instructions to sell the three stocks purchased in IPOs; a loss of $6,500 from failing to execute a sell order on ATMEL; and a loss of over $51,000 on a land development project which Letsos attributed to the losses incurred as a result of Clemente's misconduct.

As nearly as can be determined from Commonwealth's memorandum, it contends first that Letsos' initial direction that his stock positions be sold came on September 15, 1995, 45 days after opening the account. From this premise it reasons that Commonwealth can be liable, at most, only for the decline in value that occurred subsequently, which it claims was no more than $15,000 to $20,000.[24] It then goes on to argue that Letsos failed to mitigate his damages by (1) telling Commonwealth management to sell after Clemente disregarded his instructions or (2) selling through an account at another firm.[25] There is a suggestion also that Letsos ratified Clemente's actions or otherwise is precluded from challenging them by his failure to insist in an October 1995 telephone call with a member of Commonwealth management that his positions be liquidated.[26]

There is a multitude of problems with Commonwealth's position. To begin with, it ignores entirely the arbitrators' uncontroverted ability, given their finding of liability, to award Letsos the $23,275 in fees and expenses that he sought. In consequence, Commonwealth's challenge must be rejected unless Commonwealth has established that there was no conceivable way in which the arbitrators could have

found $51,725 in other actual damages without manifestly disregarding the law. It has not done so.

 To begin with, the lack of a complete record alone is sufficient to require rejection of Commonwealth's position. It is Commonwealth's burden to demonstrate manifest disregard of the law, and the failure to offer the entire record leaves the Court unable to exclude the possibility that the award is supported by evidence that Commonwealth has not placed before it.

Even if the Court were to assume that the bits and pieces of materials submitted here in fact are parts of the record, moreover, there is ample basis for the award. Letsos' account statements, to the extent that they are included here, show that he lost in excess of $24,000 on the stocks purchased in IPOs.[27] They demonstrate also that he lost a total of over $27,000 on Happiness Express (HAPY) and ORTEL, stocks that Clemente allegedly bought without his consent, and almost $11,000 on ATML, a good part of which came following Clemente's failure to execute Letsos' sell order.[28] Hence, Letsos produced evidence that showed substantial losses from unauthorized purchases, failures to execute sell orders, and arguably unsuitable investment recommendations before even considering the claim for the opportunity cost of the funds that were lost.

Commonwealth, to be sure, contends here as it evidently contended before the panel that Letsos became aware of unauthorized purchases, the unsuitability of investments and the failure to execute his

**24.** Pet.Mem. 18–19; *see also* Garman Aff. ¶¶ 16–20.

**25.** Pet.Mem. 19.

**26.** *See* Garman Aff. ¶ 9(c).

**27.** The statement for the periods ending August 25, 1995 and October 27, 1995 show that he bought 2,000 shares of IDTI sometime in the period August 26, 1995 through September 29, 1995, although the date and price cannot be pinpointed because the statement

dated September 29, 1995 is missing. (Flack Aff.Ex. 8) Letsos' letter to Commonwealth (*id.* Ex. 16, Letsos ltr. to Campanelle, 1/17/96) states that he paid $52,000 for it. He sold the position on November 29, 1995 for $30,445 for a loss of $21,555. (*Id.* Ex. 8) The statements show also that he lost approximately $3,000 on TYGN.

**28.** Flack Aff.Exs. 8, 16 (Letsos ltr. to Campanelle, 1/17/96, at 4).

orders and that it would be inappropriate to permit him to hold Commonwealth responsible for losses sustained from that point forward on theories of waiver, estoppel and ratification. But the waiver, estoppel and ratification theories all involved factual questions concerning the points at which Letsos became aware of the key facts, whether and when he intended to waive his rights or to lead Clemente or Commonwealth to rely on his inaction and, at least for purposes of estoppel, whether they justifiably did so to their detriment.[29] The mitigation argument depended on an assessment of the reasonableness of Letsos' actions in all the circumstances. The arbitrators quite obviously awarded Letsos far less than the $181,000 in compensatory damages that he claimed, thus demonstrating that they accepted Commonwealth's argument to a significant degree. There surely is no basis on this record for saying that their failure to accept the entirety of its argument reflected manifest disregard for law.

### Punitive Damages

The challenge to the $45,000 punitive damage award against Commonwealth is twofold. Petitioner appears to assert first that the award reflects manifest disregard of law because there was no intentional, malicious or grossly oppressive conduct[30] and that arbitrators may not award punitive damages under the controlling New York law.[31] In any case, it claims, the award runs afoul of the Due Process Clause. Both arguments, however, are frivolous.

■■■ Whatever Letsos may have said to the effect that he assumed that Clemente was trying to turn a profit for him, the existence of conduct sufficient to sustain awards of punitive damages is patent. The record, such as it is, would have justified the panel in finding that Clemente repeatedly and intentionally purchased stocks without Letsos' authority and disregarded his instructions concerning his account. While Clemente may have hoped that everything would come right in the end, the arbitrators had ample basis for finding the sort of intentional, reprehensible and oppressive behavior that permitted the imposition of punitive damages against Clemente under well established standards. Nor was there any shortage of evidence against Commonwealth. While punitive damages may not be imposed against it purely on a vicarious liability theory,[32] there was ample evidence of misconduct by a responsible official of the firm. Mark Siegel, Clemente's supervisor, urged Letsos not to make a compliance matter out of his grievances but to work things out with Clemente in order to avoid getting Clemente in trouble.[33] This in itself was a gross deviation from responsible behavior by a registered broker-dealer, which effectively is under a statutory obligation to supervise its personnel "with a view to preventing [securities] violations . . ."[34]

The assertion that the New York governing law clause in the arbitration agreement precluded the arbitrators from awarding punitive damages is even more specious. In *Mastrobuono v. Shearson Lehman Hutton, Inc.*,[35] which Commonwealth does not even discuss, the Supreme Court rejected precisely this argument, holding that the agreement to arbitrate in

---

**29.** *E.g., Coastal Power Int'l Ltd. v. Transcont. Capital Corp.*, 10 F.Supp.2d 345, 370 (S.D.N.Y.1998) (waiver); *Cherry River Music Co. v. Simitar Ent., Inc.*, 38 F.Supp.2d 310, 318 (S.D.N.Y.1999) (estoppel) (citing cases); *Integrated Consulting Servs., Inc. v. LDDS Comm., Inc.*, 996 F.Supp. 470, 476 (D.Md. 1998) (ratification).

**30.** Pet.Mem. 6.

**31.** *Id.* 7.

**32.** *See Mason v. City of New York*, 949 F.Supp. 1068, 1072 (S.D.N.Y.1996).

**33.** Flack Aff.Ex. 4, at 9–10.

**34.** 15 U.S.C. § 78o(b).

**35.** 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995).

accordance with NASD rules permitted the conclusion that an award of punitive damages by the panel was permissible in appropriate circumstances.[36]

 The due process challenge to the award also is without merit. The principal basis for the argument seems to be that the limited scope of judicial review of arbitration awards renders all punitive damage awards by arbitrators unconstitutional. At least one clear response to the argument, however, is that Commonwealth's insistence that customer disputes be resolved by arbitration inherently accepted any limitations on judicial review of awards rendered in the arbitral forum.[37] Indeed, as the New York Court of Appeals recently stated, "it would be ironic and anomalous to permit parties from the securities industry, who generally derive benefits from the arbitration method they impose on their thousands of consumers, to elude their own industry-drafted arbitration agreements." [38]

### The Sanctions Motion

Respondent has moved for Rule 11 sanctions on the grounds that the petition to vacate the award was filed for an improper purpose and that counsel breached his duty of candor to the Court by failing to cite *Sanders v. Gardner*,[39] a district court case very much at odds with petitioner's position.[40]

 While the petition lacked merit, the bases advanced by respondent do not warrant the imposition of sanctions. The Court is not prepared to say that the petition was filed for an improper purpose, particularly as the likely award of interest presumably would eliminate any motive to delay for its own sake. And while the better course would have been to cite and seek to distinguish *Sanders*, the case is not "controlling" authority which counsel, strictly speaking, was ethically bound to bring to the Court's attention.[41]

### Conclusion

For the foregoing reasons, the petition to vacate the arbitration award [1–1] and the motion for Rule 11 sanctions [10–1] are denied in all respects. The motion to confirm the award and enter judgment thereon [4–1] is granted. The Clerk shall enter judgment in favor of respondent and against petitioner in the amount of $120,-000 together with interest thereon at the rate of 9 percent from May 28, 1998 to the date of the judgment.[42]

SO ORDERED.

---

**36.** *Id.* at 60–61, 115 S.Ct. 1212.

**37.** *E.g., Todd Shipyards Corp. v. Cunard Line, Ltd.,* 943 F.2d 1056, 1063–64 (9th Cir.1991) (defendant's agreement to arbitration waived due process challenge to award of punitive damages by arbitrators).
> While the Court does not reach the issue, the Court respectfully doubts that the rationale for this result set forth in *Davis v. Prudential Sec., Inc.,* 59 F.3d 1186, 1191 (11th Cir.1995), and *Sanders v. Gardner,* 7 F.Supp.2d 151, 173 (E.D.N.Y.1998)—viz. that an arbitration award involves no state action—is well founded. While the procedures utilized in private arbitration do not constitute state action, *see, e.g., Austern v. Chicago Bd. Options Exch., Inc.,* 716 F.Supp. 121, 125 (S.D.N.Y.1989), the application of the coercive power of a court to confirm and enforce an arbitration award arguably is another matter.

**38.** *Smith Barney Shearson, Inc. v. Sacharow,* 91 N.Y.2d 39, 50, 666 N.Y.S.2d 990, 996, 689 N.E.2d 884 (1997).

**39.** *Supra* note 37.

**40.** A far better argument could be made based on petitioner's argument that the New York governing law clause in the arbitration agreement forecloses an award of punitive damages, an argument made without disclosure of the fact that the United States Supreme Court had rejected precisely that argument only a few short years ago.

**41.** *See* N.Y. Code of Prof.Resp. EC 7–23.

**42.** Respondent is entitled to interest on the award from the date of its entry to the date of the judgment. *Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.,* 866 F.2d 11 (1st Cir.

1989). Prejudgment interest is governed by New York law both because this is a diversity case and because the arbitration agreement contains a New York governing law clause. *See Northrop Corp. v. Triad International Marketing S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988) (state law determined the rate of post-award, pre-judgment interest in a diversity action enforcing an arbitration award under the Federal Arbitration Act); *see also Coastal Power Intern. Ltd v. Transcontinental Capital, Corp.*, 10 F.Supp.2d 345, 371 (S.D.N.Y.1998) Moreover, of Letsos' seven claims pressed in his arbitration, only one was predicated on federal law. In consequence, the Court applies New York's statutory rate of interest. N.Y. CPLR § 5004.