[754 NYS2d 264]

STEPHEN B. SAWTELLE, Appellant-Respondent, et al., Petitioner, v WADDELL & REED, INC., et al., Respondents-Appellants, et al., Respondent.

First Department, February 11, 2003

### APPEARANCES OF COUNSEL

*Jeffrey L. Liddle* of counsel (*Michael E. Grenert* on the brief; *Liddle & Robinson, L.L.P.*, attorneys), for appellant-respondent.

*Seth M. Schwartz* of counsel (*Susan L. Saltzstein, Timothy G. Nelson* and *Theodore Sonde* on the brief; *Skadden, Arps, Slate, Meagher & Flom LLP* and *Crowell & Moring LLP*, attorneys), for respondents-appellants.

### OPINION OF THE COURT

SULLIVAN, J.

At issue on these cross appeals from the confirmation of an arbitration award of approximately $27 million in favor of a mutual fund broker is the rationality and legality of the award of $25 million in punitive damages. The award was based on a finding that the broker's employer and certain of its representatives, in an attempt to compete with the broker after his termination, had interfered with his prospective business relations in violation of the Connecticut Unfair Trade Practices Act (Conn Gen Stat § 42-110a *et seq.* [CUTPA]).

Petitioner Stephen B. Sawtelle was employed for 17 years by respondent Waddell & Reed, Inc., a member of the National Association of Securities Dealers, Inc. (NASD) and Kansas-based registered securities broker-dealer, as its registered representative in Connecticut until February 10, 1997. Until his termination, Sawtelle had been one of Waddell's most successful salesmen, with approximately 2,800 customers, none of whom had ever made a complaint against him. In fact, as late as February 3, 1997, Sawtelle had received accolades from Waddell for his work and status as the "number one broker" in 1996. In terminating Sawtelle, Waddell cited personality differences. At the arbitration hearing, Sawtelle testified that he was terminated in retaliation for his testimony before the Securities and Exchange Commission (SEC) regarding the activities of another Waddell broker, David Stevenson, fired by Waddell in 1996 and subsequently convicted of embezzling millions of dollars from his clients. Waddell disputed Sawtelle's

account, claiming that he was terminated because of suspicions about his own improper practices.

On February 11, 1997, one day after his termination, Sawtelle joined Hackett Associates,[1] a Waddell competitor, thus igniting a competition between Sawtelle and Waddell for the accounts of the 2,800 customers previously serviced by Sawtelle. On that same day, Waddell wrote to Sawtelle's customers, informing them that he was no longer its representative. The letters, which could be construed as threatening, explained the potential tax liabilities and other fees if the customers transferred their investments. This language did not appear in the letters mailed to Stevenson's customers after his dismissal. Sawtelle mailed his own letter to the same 2,800 customers on February 26, 1997, informing them of his new association and soliciting their business. Ultimately, over a short period of time, Sawtelle retained the lion's share of that customer base.

During this period, representatives of Waddell misrepresented to customers of Sawtelle who called after receipt of the February 10, 1997 letter that they did not know Sawtelle's whereabouts, suggesting, on several occasions, that Sawtelle might have engaged in criminal conduct similar to that of Stevenson. One alarmed customer even called the police. Waddell also rerouted mail from Sawtelle's North Haven, Connecticut office to Waddell's Hamden, Connecticut office, and transferred Sawtelle's phone calls to Waddell's office. The Waddell officer who received letters from Sawtelle's lawyers, written on February 13 and 18, 1997, informing Waddell of Sawtelle's new address and telephone number and requesting that customers inquiring about Sawtelle be so notified, failed to notify other Waddell representatives until five weeks later.

Pursuant to applicable NASD rules, Waddell was required to prepare a form U-5, Uniform Notice of Termination, disclosing the reasons for Sawtelle's separation from the firm. On the U-5 form prepared on March 4, 1997, Waddell indicated that Sawtelle had been discharged for "personality differences." As to question number 14 on the form, asking whether the individual involved is under investigation by a governmental body or self-regulatory organization with jurisdiction over investment-related businesses, Waddell responded "yes." Waddell also answered "yes" to question 15, which asked whether the indi-

---

1. An award in favor of Hackett, not a party to this appeal, was confirmed, without opposition, by the Supreme Court.

vidual was under internal review for fraud or wrongful taking of property, or for violating investment-related statutes, regulations or industry standards of conduct. While Waddell claimed that its responses were based on Sawtelle's testimony before the SEC with respect to the Stevenson matter and its subsequent internal review, its witness conceded that Stevenson's supervisors, one of whom was Sawtelle, could not have detected his embezzlement and that in responding "yes" to question 14 it gave the impression that Sawtelle was under SEC investigation for fraud.

The form U-5 also reported that a customer had complained about the inadequacy of Sawtelle's services, a claim subsequently investigated and rejected by the NASD, which issued a "no action" letter. Waddell subsequently filed amendments to Sawtelle's form U-5, reporting new complaints from a dozen customers who, subsequent to Sawtelle's termination, wrote that he had misrepresented the fees on their investments and given poor advice.

Sawtelle also offered evidence that Waddell had solicited complaints against him by offering customers improper incentives, such as a waiver of transfer fees. For example, one customer who initially wrote a handwritten letter to Waddell in broken English, wrote a second letter, typed in proper English, making more substantial allegations against Sawtelle. Another customer, claiming that $21,000 was missing from its account because of Sawtelle, withdrew the complaint when it realized that the $21,000 had been properly distributed to an employee. The NASD, after investigation, issued "no action" letters on the new complaints. Sawtelle also testified that when customers tried to switch their accounts to another investment they were frustrated by Waddell's delay or failure to follow their directions, sometimes with unwarranted tax consequences.

In July 1997, Sawtelle filed a statement of claim against Waddell and certain of its officers and representatives with the NASD, alleging, as noted, tortious interference with business expectancy and a violation of CUTPA. On or about November 14, 1999 Waddell filed a statement of claim against Hackett, based on Sawtelle's actions. The two proceedings were consolidated and, on September 11, 2000, the three-member panel granted Hackett's motion to dismiss the claims against it. On August 7, 2001, after more than 50 days of hearings, held over a period of 2½ years, the panel issued its award finding all the respondents jointly and severally liable for $1,827,499 in

compensatory damages, plus attorneys' fees of $747,000 and Waddell and its president, Robert L. Hechler, jointly and severally liable under CUTPA for punitive damages in the sum of $25 million for their reprehensible conduct in orchestrating a campaign of deception that included giving the impression that Sawtelle had mishandled his clients' investments, was untrustworthy, was not authorized to do business and, in some way, had been involved in the embezzlement of clients' funds. The panel also ordered the expungement of certain entries on the form U-5.

Sawtelle commenced this proceeding in New York State Supreme Court to confirm the award. Respondents crosspetitioned to vacate or modify the award, arguing that the punitive damages award was irrational and made in manifest disregard of law, that the compensatory damages award was erroneous in that it included Sawtelle's attorneys' fees, although attorneys' fees were awarded as a separate item of damage, and that the portion of the award requiring Waddell to amend its form U-5 disclosure was irrational. The motion court modified the award to the extent of reducing the compensatory damages award by $747,000 to $1,080,499 to reflect the panel's double award of attorneys' fees. The court declined to disturb the punitive damage award, noting the limited scope of review of arbitral awards under the Federal Arbitration Act (FAA), and rejected respondents' argument that judicial review of punitive damages is governed by the standard set forth in *BMW of N. Am., Inc. v Gore* (517 US 559), which, according to the motion court, dealt purely with due process concerns not relevant in arbitration proceedings. Even if *Gore* applied, the court held, the award was not irrational or violative of public policy. Nor, according to the court, was the award otherwise illegal or irrational as grossly excessive since CUTPA, which authorizes an award of punitive damages, does not, by its terms, place limits on such an award. Finally, the court upheld the award insofar as it directed expungement of certain entries on the form U-5. This appeal followed. We modify to vacate the punitive damage award and remand for reconsideration of that issue.

Since, as the Court of Appeals has held, "the arbitration of disputes concerning employment in the securities industry * * * [is] governed by the Federal Arbitration Act" (*Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith*, 85 NY2d 173, 180), judicial review of this award is governed by the FAA (9 USC § 1 *et seq.*). As the United States Supreme Court has

repeatedly expressed, the FAA embodies a strong "liberal federal policy favoring arbitration agreements," providing only for extremely limited judicial review of an arbitration award (*Green Tree Fin. Corp.-Ala. v Randolph*, 531 US 79, 91, quoting *Moses H. Cone Mem. Hosp. v Mercury Constr. Corp.*, 460 US 1, 24; *Providence Journal Co. v Providence Newspaper Guild*, 271 F3d 16, 20). Under the statute, a court may vacate an arbitration award either on the grounds set forth in section 10 (a) of the FAA or on one of the several judicially recognized "nonstatutory" grounds, such as irrationality (*see I/S Stavborg [O.H. Meling, Mgr.] v National Metal Converters, Inc.*, 500 F2d 424, 430 [2d Cir]), a principle which this Court recently reaffirmed (*see Matter of Spear, Leeds & Kellogg v Bullseye Sec.*, 291 AD2d 255, 256 [on review under FAA, affirming order setting aside award without basis in record as irrational]), manifest disregard of the law or evidence (*Halligan v Piper Jaffray, Inc.*, 148 F3d 197, 202 [2d Cir], *cert denied* 526 US 1034) or public policy (*Diapulse Corp. of Am. v Carba, Ltd.*, 626 F2d 1108, 1110 [2d Cir]).

Since arbitration awards are, under federal law, subject to extremely limited review, the "showing required to avoid summary confirmation of an arbitration award is high"; a party moving to vacate the award has the burden of proof (*Willemijn Houdstermaatschappij, BV v Standard Microsystems Corp.*, 103 F3d 9, 12 [2d Cir]; *Halligan*, 148 F3d at 202). "[M]anifest disregard 'clearly means more than error or misunderstanding with respect to the law' [citation omitted]" and "to modify or vacate an award on this ground, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case" (*Halligan* at 202; *DiRussa v Dean Witter Reynolds Inc.*, 121 F3d 818, 821, *cert denied* 522 US 1049). "[A] court may infer that the arbitrators manifestly disregarded the law if it finds that the error made by [them] is so obvious that it would be instantly perceived by the average person qualified to serve as an arbitrator" (*Willemijn Houdstermaatschappij*, 103 F3d at 13). "[D]etermining whether to make this inference is not an easy task and a reviewing court must proceed with caution. If there is 'even a barely colorable justification for the outcome reached,' the court must confirm the arbitration award" (*id.*, quoting *Matter of Andros Cia. Maritima, S.A. of Kissavos [Marc Rich & Co., A.G.]*, 579 F2d 691, 704).

In *BMW of N. Am., Inc. v Gore* (517 US 559, *supra*), the Supreme Court set forth three factors for consideration in

determining whether a punitive damage award is "grossly excessive" (*id.* at 562) in violation of the Due Process Clause of the Fourteenth Amendment: (1) a comparison of the amount of the punitive damages award with the amount of the "civil or criminal penalties that could be imposed for comparable misconduct" (*id.* at 583); (2) a comparison of the amount of punitive damages "to the actual harm inflicted on the plaintiff" (*id.* at 580); and (3) "the degree of reprehensibility of the defendant's conduct" (*id.* at 575). According wide "latitude" to the factfinders' determination of the size of punitive awards, *Gore* holds that such awards should be set aside as grossly excessive only if they fall into a "zone of arbitrariness" (*id.* at 568). Thus, a test that on review recognizes a factfinder's wide latitude in determining a punitive damages award does not offend the FAA's pro-arbitration policy. A grossly excessive award that is arbitrary and irrational under *Gore* should be equally arbitrary and irrational under the FAA.

In *Gore*, the plaintiff had brought suit against BMW under Alabama's unfair trade practices statute after he discovered that the car he had purchased ostensibly as new had been repainted. The jury awarded him $4,000 in compensatory damages and $4 million in punitive damages, which the Alabama Supreme Court reduced to $2 million. The Supreme Court held that the remittur award of $2 million was grossly excessive and violated BMW's right to due process since the defendant could not have been on notice that its conduct would subject it to that magnitude of damages. Although, under a due process analysis, *Gore* established the constitutional limits on the imposition of punitive damages, *Gore* has been applied in cases where it is alleged merely that the damages are "grossly excessive" (*see Lee v Edwards*, 101 F3d 805, 809-810 [2d Cir] [applying the *Gore* factors to a claim under 42 USC § 1983]; *Acciardo v Millennium Sec. Corp.*, 83 F Supp 2d 413, 422; *Sanders v Gardner*, 7 F Supp 2d 151, 174-177 [ED NY] [applying *Gore* standard to determine excessiveness of securities arbitration award while rejecting applicability of due process claim]).

The motion court declined to apply the *Gore* factors to the instant award, apparently accepting Sawtelle's argument that *Gore*'s concern is only with due process, a principle which is inapplicable to private arbitration. Admittedly, there is ample authority for the proposition that a private arbitration does not implicate due process concerns since, where the parties have voluntarily participated in the arbitration process, there is no state action involved, not even in the judicial confirmation of

the punitive damage award (*Davis v Prudential Sec., Inc.*, 59 F3d 1186, 1191 [11th Cir]; *Sanders v Gardner*, 7 F Supp 2d at 174-175; *but see Commonwealth Assoc. v Letsos*, 40 F Supp 2d 170, 177 [SD NY] [application of coercive power of court to confirm and enforce award involves state action]). This reasoning is, however, besides the point since *Gore* is not only applicable to due process analysis of a punitive damage award but also provides a guide for determining whether such an award is irrational.

A number of cases have recognized that the *Gore* test has application outside the realm of a due process claim in a review of a punitive damage award. In *Lee v Edwards* (101 F3d 805, *supra*), the defendant, without asserting a due process violation, challenged a $200,000 punitive damage award solely on the ground of excessiveness. In reviewing the challenge, the Second Circuit Court of Appeals held the nonconstitutional test for excessiveness to be whether the amount of the award is " 'so high as to shock the judicial conscience and constitute a denial of justice' " (*id.* at 808, quoting *Hughes v Patrolmen's Benevolent Assn. of City of N.Y., Inc.*, 850 F2d 876, 883, *cert denied* 488 US 967). In that context, the court evaluated the alleged excessiveness of the award under the *Gore* guideposts, finding that *Gore* "should assist us in the application of our standard, by which we deem excessive a punitive damage award that 'shocks our judicial conscience' " (*id.* at 809, citing *Hughes* at 883).

In *Sanders v Gardner* (7 F Supp 2d 151, *supra*), in holding that a $10 million punitive damage arbitration award against an NASD broker-dealer did not violate his due process rights, the court nevertheless conducted a separate and independent analysis to determine whether the arbitrator's award was excessive under the *Gore* standard, noting that *Gore* and its antecedents "help illustrate the relevant analysis of excessiveness of punitive damages" (*id.* at 176). In *Park v First Union Brokerage Servs., Inc.* (926 F Supp 1085, 1090 [MD Fla]), the court applied *Gore* and held that an arbitration award of punitive damages was not "representative of a 'grossly excessive' award that cries out for vacatur." And in *Mathie v Fries* (121 F3d 808, 817 [2d Cir]), the court, in considering a punitive damages award under 42 USC § 1983, held, "The Supreme Court's guideposts in *Gore*, though marking outer constitutional limits, counsel restraint with respect to the size of punitive awards even as to the nonconstitutional standard of excessiveness." We conclude therefore that *Gore* provides the

appropriate standard in determining the excessiveness of an arbitration award of punitive damages under FAA review.

Under *Gore*, the third test, i.e., the degree of reprehensibility of a defendant's misconduct, is "[p]erhaps the most important" consideration in determining the rationality of a punitive damages award (517 US at 575). In essence, the posttermination dispute here involves a contest between a securities firm and its discharged representative and the firm that he joined over the customers previously serviced by the representative. The dispute reflected a one-time incident of limited duration and had little or no impact on Sawtelle's earnings (*see id.* at 576). He never disputed that he continues to be successfully employed as a stockbroker with income of over $800,000 a year. The panel did not find any "history of noncompliance with known statutory requirements" or any other history of misconduct as *Gore* would require to sanction past misconduct (*id.* at 585). Nor does the conduct complained of here bear any resemblance to the type of aggravating conduct, such as "indifference to or reckless disregard for the health and safety of others" (*id.* at 576), required under *Gore* to justify a large punitive damage award.

In its analysis of the severity of Waddell's conduct with respect to the size of the punitive damages award, the motion court observed that it was not persuaded that Waddell was not "on notice that it [was] risking a very substantial award against it." But, "even outrageous conduct will not support an oppressive or patently excessive award of damages" (*Vasbinder v Scott*, 976 F2d 118, 121 [2d Cir], quoting *Brink's Inc. v City of New York*, 546 F Supp 403, 413-414 [SD NY]). Given Sawtelle's hiring by Hackett one day after his discharge from Waddell, his retention of most of his 2,800 clients and his continued and current level of income, Waddell's misconduct in waging a smear campaign, while not to be condoned, apparently failed, and was not so egregious as to warrant a $25 million punitive damages award. This award dwarfs the total compensatory damages by a factor of 23, well above the four-to-one ratio that the Supreme Court regards as "close to the line" (*Pacific Mut. Life Ins. Co. v Haslip*, 499 US 1, 23). Moreover, it greatly exceeded the ratio of two to one commonly used under Connecticut law, which had been suggested to the panel by Sawtelle's own counsel. In awarding punitive damages under CUTPA, "[m]any courts have followed the lead of the district court in *Bailey Empl. Sys. v Hahn*, 545 F. Supp. 62, 73 (D. Conn. 1982), *aff'd*, 723 F.2d 895 (2d Cir. 1983), in doubling the

amount of actual or compensatory damages" (*Bristol Tech., Inc. v Microsoft Corp.*, 114 F Supp 2d 59, 79 [D Conn], *vacated on other grounds* 250 F3d 152 [2d Cir]).

The punitive damage award here also runs afoul of *Gore* because it is vastly out of proportion to the "civil or criminal penalties that could be imposed for comparable misconduct" (517 US at 583). In comparing the amount of the punitive damages award with the amount of any penalty authorized under an applicable statute proscribing the wrongdoing at issue, the reviewing court "should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue'" (*id.* [citation omitted]). It is also "appropriate * * * to examine punitive damage awards in similar cases" (*Lee v Edwards, supra*, 101 F3d at 812).

In that regard, as the record shows, the award exceeded by far any past CUTPA award or any NASD award in a broker termination dispute.[2] Indeed, "[a] review of the punitive damage awards in CUTPA cases before state and federal courts reveals that the awards range from $250 to $450,000" (*Bristol Tech., Inc. v Microsoft Corp., supra*, 114 F Supp 2d at 93). The largest award of punitive damages under CUTPA in a Connecticut state court is only $168,000 (*see Perkins v Colonial Cemeteries, Inc.*, 53 Conn App 646, 734 A2d 1010) and most such awards have been much lower.[3]

Moreover, as of 1997, when the misconduct involved here occurred, no federal award of punitive damages under CUTPA had ever exceeded $1 million.[4] The two largest prior CUTPA awards are readily distinguishable. In *Bristol Tech., Inc. v Microsoft Corp.* (114 F Supp 2d 59, *supra*), decided in 2000, in which it was found that the defendant had engaged in a "bait-and-switch" software marketing scheme involving several

---

2. The motion court took note of a $208.7 million punitive damages award against a stockbroker in a New York Stock Exchange (NYSE) arbitration decided after the instant award. The award, however, is hardly a precedent given that it also included a $208.7 million compensatory damage award, reflecting a one to one ratio, based on a finding of massive fraud.

3. *See e.g. Hi-Ho Tower, Inc. v Com-Tronics, Inc.*, 255 Conn 20, 761 A2d 1268 ($120,000); *Willow Springs Condominium Assn., Inc. v Seventh BRT Dev. Corp.*, 245 Conn 1, 20, 717 A2d 77, 89 ($100,000); *Tessmann v Tiger Lee Constr. Co.*, 228 Conn 42, 43, 634 A2d 870, 872 ($30,000).

4. *See e.g. Tingley Sys., Inc. v Norse Sys., Inc.*, 49 F3d 93, 96 (2d Cir) ($1 million reduced to $20,000); *Grand Light & Supply Co., Inc. v Honeywell, Inc.*, 771 F2d 672, 674 (2d Cir) ($25,000); *Societa Bario E Derivati v Kaystone Chem., Inc.*, 1998 WL 182563, *10, 1998 US Dist LEXIS 23066, *29 (D Conn) ($10,000); *Tillquist v Ford Motor Credit Co.*, 714 F Supp 607, 617 (D Conn) ($500); *Bailey Empl. Sys., Inc. v Hahn*, 545 F Supp 62, 73, *supra* ($26,946).

victims over a period in excess of two years, where "[h]undreds of millions, if not billions, of dollars of commerce were at stake" (*id.* at 83, 94), the court held that such misconduct, wholly absent here, justified punitive damages of $1 million, an award "sufficiently large to deter similarly egregious deceptive conduct by Microsoft and other similarly situated actors in the future" (*id.* at 95). In contrast, what is involved here is an ordinary commercial dispute between essentially two parties, with no widespread impact.

In *United Tech. Corp. v American Home Assur. Co.* (118 F Supp 2d 174 [D Conn]), the court awarded $16 million in punitive damages against an insurer, which, for over a decade, engaged in an "intentional scheme" and deliberately stalled the processing of large claims, a practice that it "repeated nationwide" (*id.* at 180). The plaintiffs were awarded compensatory damages of $21 million,[5] an amount larger than the $16 million in punitive damages awarded. Thus, the $25 million punitive damages awarded here bears no rational relationship to the amount of compensatory damages sustained by Sawtelle or to the severity or extent of Waddell's misconduct, and is totally out of proportion to the statutory penalty provided and damages awarded in prior comparable cases and cannot stand.

Moreover, as noted, under the FAA, an arbitration award may be vacated if it is in " 'manifest disregard' of the law" (*Matter of Spear, Leeds & Kellogg v Bullseye Sec.*, *supra*, 291 AD2d at 256, quoting *Halligan v Piper Jaffray, Inc.*, *supra*, 148 F3d at 204.) In this context, " 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it" (*Merrill Lynch, Pierce, Fenner & Smith, Inc. v Bobker*, 808 F2d 930, 933 [2d Cir]). Here, in awarding $25 million in punitive damages, the panel completely ignored applicable law, an error that provides a separate basis for vacating the award.

Although, during the arbitration, the parties did not make specific reference to the *Gore* standards, Sawtelle's counsel told the panel that the "proportionality" of punitive damages was "a very big constitutional issue" and that, generally, Connecticut courts had held that punitive damages under CUTPA might be awarded at a two to one ratio without "offend[ing]" constitutional principles. Sawtelle's counsel similarly informed

---

5. This amount represented damages plus prejudgment interest. The compensatory damage verdict was $14,131,094 (*United Tech. Corp. v American Home Assur. Co.*, 118 F Supp 2d 190, 199-200 [D Conn], *vacated on other grounds* 237 F Supp 2d 168).

the panel that Connecticut law required a showing of "reprehensible conduct." In response to a question from the panel, counsel stated that neither CUTPA nor Connecticut case law applying it would support an award of treble damages. Where, as here, "counsel for both parties generally agreed on the applicable law * * * and explained it to the arbitrators" (*Halligan*, 148 F3d at 204), their failure to adhere to the relevant standards constitutes "manifest disregard [of] the law" (*id.*).

It is no answer to argue, as the motion court noted, that "the law on either the maximum ratio or the maximum amount, of punitive damages that can be awarded under CUTPA is by no means 'well defined [and] explicit' [citation omitted]." The requirement that punitive damages be proportional to compensatory damages is well defined and explicit. A punitive damage award, as the Supreme Court has long held, may not be "wholly disproportioned to the offense" (*St. Louis, Iron Mtn. & S. Ry. Co. v Williams*, 251 US 63, 67 [1919]). As *Gore* noted, "[t]he principle that punishment should fit the crime 'is deeply rooted and frequently repeated in common-law jurisprudence.' [citations omitted]" (517 US at 575 n 24). Since both sides agreed on this well-settled rule of proportionality and the panel was specifically advised of its existence, its $25 million punitive damages award, grossly disproportionate to the compensatory damages awarded, was made in manifest disregard of law.

Moreover, in addition to the federal constraints on punitive damages, rigorous judicial review under the "manifest disregard" standard is especially warranted here in light of Connecticut's own restrictive legislative and common-law policies as reflected in CUTPA's specific exclusion of punitive damages from a jury's consideration (*see* Conn Gen Stat Ann § 42-110g [g] ["In any action * * * under this section there shall be a right to a jury trial except with respect to the award of punitive damages"]). In agreeing to arbitration, Waddell did not waive its right to the protection of any constitutional and statutory constraints on the award of punitive damages. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum" (*Mitsubishi Motors Corp. v Soler Chrysler-Plymouth, Inc.*, 473 US 614, 628; *Cole v Burns Intl. Sec. Servs.*, 105 F3d 1465, 1487).

The District of Columbia Circuit Court of Appeals has admonished that the Supreme Court's avowed faith in an arbitral forum's ability to adjudicate statutory claims will be

vindicated "only if judicial review under the 'manifest disregard of the law' standard is sufficiently rigorous to ensure that arbitrators have properly interpreted and applied statutory law" (*Cole* at 1487). If arbitrators fail to adhere to applicable statutory standards, "courts will have no choice but to intercede" (*id.* at 1488).

As noted, under the FAA, an arbitration award may also be vacated where it is "contrary to a well accepted and deep rooted public policy" (*Diapulse Corp. of Am. v Carba, Ltd., supra*, 626 F2d at 1110). Waddell claims that the punitive damage award violates public policy because it punishes Waddell for complying with its obligations under federal and state securities laws to report customer complaints against Sawtelle. Upon receiving complaints from Sawtelle's customers, Waddell argues, it was obligated to disclose them to the NASD, and would be subject to sanction if it did not. These complaints ranged from forging signatures to misrepresenting fees and conducting unauthorized securities transactions.

The motion court accepted Sawtelle's unsupported characterization of these complaints as "setup [ ] jobs" instigated by Waddell. Nothing in the record, however, supports the inference that Waddell falsified complaints or suborned customers to swear falsely in affidavits. Apparently, Sawtelle's only basis for criticizing Waddell's handling of complaints against him was that complaining customers had their fees waived, a course of action, it seems to us, more reflective of good business judgment than ill will, given the seriousness of the complaints against one of Waddell's registered representatives. Significantly, however, not a single complaint resulted in any action by the NASD. Nor did the arbitration panel refer to Waddell's actions in amending its form U-5 as the reason for the imposition of its punitive damages award. In such circumstances, we reject the argument that the award violates public policy.

In his cross appeal, Sawtelle challenges the motion court's reduction of his compensatory damages by $747,000. As the court found, Sawtelle asked the arbitrators to award compensatory damages equal to the income he purportedly would have received from Waddell in 1997 but for his termination. Based on this request, the panel awarded him compensatory damages of $1,827,499, which the motion court, finding persuasive evidence of the panel's double counting of attorneys' fees, reduced to $1,080,499.

In attempting to prove his forgone 1997 income, Sawtelle proferred his earnings statement for the January 1 through

February 15, 1997 period, showing earned commission income of $95,856. It also showed $766,851 in "Annualized" income, based on the rate of earnings through February 15, 1997. Sawtelle's pay statement also contained an item headed, "Projected Annual Investment Bonus," showing an estimate of his 1997 bonus based on the estimate of his annualized base commission earnings. For 1997, the earnings statement estimated a bonus of $263,648.

In addition to annualized commission income of $766,851 and an investment bonus of $263,648, Sawtelle also claimed entitlement to "trails," moneys he would receive "on assets under management," of approximately $300,000. Sawtelle conceded that Waddell had paid him $250,000 in 1997 prior to his termination. The net total of the amounts sought, crediting the $250,000 received from Waddell, is $1,080,499. The panel awarded compensatory damages of $1,827,499, which is $747,000 more than the amount sought. The $747,000 differential awarded as part of Sawtelle's compensatory damages equals to the dollar the amount of attorneys' fees he claimed to have incurred in the arbitration. Since the panel in addition separately awarded Sawtelle $747,000 in attorneys' fees, the ineluctable conclusion is that the panel improperly awarded such fees twice, erroneously inflating the compensatory damage award by $747,000.

Section 11 (a) of the FAA authorizes judicial modification and correction of an award "[w]here there was an evident material miscalculation of figures" (9 USC § 11 [a]). Modification is authorized "[w]hen an arbitration award orders a party to pay damages that have already been paid or which are included elsewhere in the award" (*Eljer Mfg., Inc. v Kowin Dev. Corp.*, 14 F3d 1250, 1254 [7th Cir], *cert denied* 512 US 1205). Sawtelle argues that it is impermissible to speculate about the basis of an arbitrator's lump sum award and that if he can proffer a rational explanation for the additional $747,000 other than miscalculation the compensatory damage award should be confirmed. In so arguing, Sawtelle asks us to turn a blind eye to reality.

Sawtelle proffers a number of speculative theories as to what the award of an extra $747,000 could possibly represent, e.g., general damages, emotional distress, "some portion of Sawtelle's lost earnings * * * for 1998-2001" or "general damages as to Sawtelle's reputation." Unlike the situation in *Companhia de Navegacao Maritima Netumar v Armada Parcel Serv., Ltd.* (2000 WL 60200, 2000 US Dist LEXIS 558 [SD NY, Jan.

25, 2000]), there is no "legitimate basis for disputing [the] allegation of double recovery" (2000 WL at *7 n 12, 2000 US Dist LEXIS at *22 n 12). As the motion court correctly noted, Sawtelle "introduced no evidence of damages, post 1997; he did not quantify his claim for general damages; and the only testimony that he presented as to emotional distress pertained to his pretermination involvement investigation of Stevenson." In such circumstances, the conclusion is inescapable that the $747,000 component of the compensatory damage award is duplicative of the award of attorneys' fees.

Section 10 (b) of the FAA provides that where, as here, an arbitration award is vacated, "the court may, in its discretion, direct a rehearing by the arbitrators." Although not made explicit in the statute, courts have discretion to remand a matter to the same arbitration panel or a new one (*Matter of Tempo Shain Corp. v Bertek, Inc.*, 1997 WL 580775, 1997 US Dist LEXIS 14153 [SD NY, Sept. 17, 1997]). In view of the " 'twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation,' " absent a showing that the original panel is incapable of carrying out its duties impartially, courts will generally remand the matter to the original panel (1997 WL at *2, 1997 US Dist LEXIS at *5, quoting *Folkways Music Publs., Inc. v Weiss*, 989 F2d 108, 111 [2nd Cir]).

While respondents argue that the award of punitive damages is, by itself, reason to appoint a new panel and that misconduct is evidenced by the panel's double award of counsel fees and its imposition of $30,000 in sanctions ($2,000 against each of the 15 respondents) payable to Sawtelle personally because their counsel requested permission to call a greater number of witnesses than the panel desired, remand to a new panel is not warranted. Respondents have not shown any evidence of bias or serious misconduct by the panel, which heard over 50 days of testimony, covering some 10,000 pages of transcript. Indeed, respondents have argued that the double calculation of attorneys' fees was inadvertent and, contrary to their present claim, they had an opportunity to be heard before sanctions were imposed.

We have considered the parties' other arguments for affirmative relief and find that they are without merit.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Michael Stallman, J.), entered June 10, 2002, which, inter alia, reduced an arbitration award in favor of petitioner by $747,000, confirmed the

award, as modified, and denied respondents' cross motion to vacate the award of punitive damages, should be modified, on the law, to grant respondents' cross motion to vacate the punitive damage award and, except as thus modified, affirmed, without costs or disbursements, and the matter remanded to the original panel of arbitrators for reconsideration of the issue of punitive damages.

NARDELLI, J.P., ANDRIAS, BUCKLEY and FRIEDMAN, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered June 10, 2002, modified, on the law, to grant respondents' cross motion to vacate the punitive damage award and, except as thus modified, affirmed, without costs or disbursements, and the matter remanded to the original panel of arbitrators for reconsideration of the issue of punitive damages.