MEDVALUSA HEALTH PROGRAMS, INC. *v.*
MEMBERWORKS, INC.
(SC 17116)
(SC 17117)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued October 27, 2004—officially released May 17, 2005

*Barbara S. Miller* and *Robert A. Harris*, for the appellant in Docket No. SC 17116, appellee in Docket No. SC 17117 (plaintiff).

*Aaron S. Bayer* and *Jonathan M. Freiman*, with whom were *Jeffrey R. Babbin, Kevin M. Smith* and, on the brief, *Robert M. Langer, Kevin M. Kennedy* and *Steven B. Malech*, for the appellee in Docket No. SC 17116, appellant in Docket No. SC 17117 (defendant).

*Opinion*

BORDEN, J. This case involves two separate appeals.[1] In the first appeal, the defendant, MemberWorks, Inc., appeals from the judgment of the Superior Court confirming an arbitration award in favor of the plaintiff, MedValUSA Health Programs, Inc., awarding the plaintiff no compensatory damages and $5 million in punitive damages. The defendant claims on appeal that the trial court's confirmation of the arbitration award violated its right to due process under the fourteenth amendment of the United States constitution and violated the state's public policy against excessive punitive damage awards. In the second appeal, the plaintiff appeals from the judgment of the Superior Court denying the plaintiff prejudgment and postjudgment interest on the arbitration award. On appeal, the plaintiff claims that the trial court's decision was an abuse of discretion. We disagree

---

[1] In the first case, SC 17117, the defendant, MemberWorks, Inc., appealed from the judgment of the trial court to the Appellate Court. In the second case, SC 17116, the plaintiff, MedValUSA Health Programs, Inc., appealed from the judgment of the trial court to the Appellate Court. We transferred both appeals to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

with the claims advanced by both the defendant and the plaintiff in their respective appeals and, accordingly, we affirm the judgment of the Superior Court.

The record reveals the following facts and procedural background. The plaintiff is a Connecticut corporation formed by Andrew Bronfman and Andrew Fineberg to sell discount health care subscriptions for physician, dental, vision, prescription, hearing and other medically-related services to targeted segments of the general public. The defendant is a Connecticut corporation that provides membership service programs that give consumers access to discounts on a variety of products and services in many areas, including the health care industry. The parties entered into a contract whereby the plaintiff agreed to become a wholesale, nationwide vendor of one of the defendant's dental and health plans. After they entered into the contract, relations between the parties deteriorated, prompting them to amend their agreement on April 15, 1999. The amended contract delayed the "start date"[2] of the agreement and reduced the number of service units that the plaintiff was obligated to purchase within eighteen months of the start date. The amendment also changed the defendant's obligations relating to the number and density of physicians participating in the program by supplementing the original provider network (network 1) made available to the plaintiff with a second provider network (network 2), to which the plaintiff would have access when network 1 provided insufficient coverage within a state. The parties' relationship did not improve and, eventually, the plaintiff notified the defendant that it was shutting down its business operations and "evaluating [its] options with counsel." Subsequently, the plaintiff filed a demand for arbitration with the Ameri-

---

[2] The "start date" is defined in the parties' contract as "the date that all fulfillment materials and services are readily available so that [the plaintiff] can commence its business operations hereunder."

can Arbitration Association for breach of contract, breach of the implied covenant of good faith and fair dealing, and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The demand alleged that the defendant had breached the original and amended agreements by: (1) failing to communicate to the plaintiff vital information regarding the provider networks; (2) failing to ensure that the provider networks were sufficient to service the needs of the plaintiff's customers; (3) making misrepresentations about the number and distribution of physicians in network 1 and about the admitting privileges of network 2 physicians to network 1 hospitals;[3] (4) withdrawing the dental network; (5) failing to deliver fulfillment materials;[4] (6) refusing the plaintiff's requests for meetings; and (7) refusing to communicate with the plaintiff other than in writing. The plaintiff further alleged that the defendant employed these tactics for the purpose of gaining a competitive edge over the plaintiff, and that the defendant began, at a time not specified in the demand, offering to the general public membership programs modeled after that designed by the plaintiff.

The arbitration panel ruled in favor of the plaintiff on all counts, but awarded no compensatory damages, finding that the plaintiff had failed to establish damages with reasonable certainty. The panel found, however, that, because the defendant had engaged in a number of unfair and deceptive acts in violation of CUTPA, General Statutes § 42-110g (a), the provision within CUTPA providing for the award of punitive damages, justified a punitive damages award of $5 million.[5] The

---

[3] Although network 1 included a hospital network, network 2 did not.

[4] The term "fulfillment materials" refers to the membership cards and booklets that would have been made available to the plaintiff's customers.

[5] General Statutes § 42-110g (a) provides in relevant part: "The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."

defendant's unfair and deceptive acts, as found by the panel, may be summarized as follows: (1) the failure to disclose to the plaintiff the nature of its communications with network 1, some of which called into question the availability of that network for the plaintiff's enterprise; (2) the failure to disclose to the plaintiff the availability of other networks; (3) a history of misrepresenting its obligations to the plaintiff under the contract; (4) the refusal to meet with the plaintiff in a timely manner and the unavailability of one of its employees for conference calls; (5) the failure to inform the plaintiff about the elimination of free dental services from the program and its inadequate responses to the plaintiff's requests for information, including inquiries concerning the dental services; (6) the failure to provide the plaintiff with new fulfillment materials necessitated by that elimination; (7) the failure to approve in a timely manner hospital lists for advertising; (8) an insistence that all communications with the plaintiff be in writing; and (9) the preparation and distribution of an inaccurate summary of a meeting with the plaintiff. In addition to punitive damages, the panel awarded the plaintiff $387,794 in attorney's fees and $70,950 in arbitration costs.

The plaintiff timely applied to the trial court to confirm the arbitration award.[6] Soon thereafter, the defen-

[6] General Statutes § 52-417 authorizes such a motion and provides in relevant part: "At any time within one year after an award has been rendered and the parties to the arbitration notified thereof, any party to the arbitration may make application to the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, to any judge thereof, for an order confirming the award. . . ."

General Statutes § 52-421 (b) establishes the effect of confirmation of an arbitration award, providing: "The judgment or decree confirming, modifying or correcting an award shall be docketed as if it were rendered in a civil action. The judgment or decree so entered shall have the same force and effect in all respects as, and be subject to all the provisions of law relating to, a judgment or decree in a civil action; and it may be enforced as if it had been rendered in a civil action in the court in which it is entered. When

dant moved to vacate the award on three grounds: (1) the award violated Connecticut public policy, embodied in the due process clause of the fourteenth amendment of the constitution of the United States, against excessive punitive damage awards; (2) the award violated the public policy against awarding punitive damages in CUTPA actions in the absence of reckless, intentional or wanton misconduct; and (3) the excessive award evidenced a manifest disregard or patently irrational application of the law in violation of General Statutes § 52-418 (a) (4). The court denied the defendant's motion to vacate and granted the plaintiff's application to confirm the arbitration award. Subsequently, in a separate ruling, the court denied the plaintiff's motion for prejudgment and postjudgment interest. These appeals followed. Further facts and procedural history will be set forth where necessary.

I

The defendant claims that the trial court improperly confirmed the arbitrator's award because the award of punitive damages was excessive: (1) in violation of the defendant's right to due process under the fourteenth amendment to the United States constitution; and (2) in violation of well-defined Connecticut public policy.[7]

the award requires the performance of any other act than the payment of money, the court or judge entering the judgment or decree may direct the enforcement thereof in the manner provided by law for the enforcement of equitable decrees."

[7] The plaintiff argues that these claims are not properly before this court because the defendant failed to argue to the arbitration panel that the failure to award compensatory damages should place a limit on the amount of punitive damages that the panel could award. Regarding the defendant's public policy claim, however, we have already stated, in *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 430, 747 A.2d 1017 (2000), that "often the question of whether [an] award [violates public policy] will not arise until after the award has been rendered. . . . Thus, in such a case, there would be no reason to defer to the arbitrator regarding a question that might not have been considered in the arbitration proceeding." (Citations omitted.) As for the defendant's due process claim, because it is premised upon judicial confirmation of the arbitration award, the defendant

We disagree. We conclude that, because an arbitration award does not constitute state action and is not converted into state action by the trial court's confirmation of that award, an arbitration panel's award of punitive damages does not implicate the due process clause, regardless of how excessive the award may be. Furthermore, we conclude that, because Connecticut does not have a well-defined public policy against the award of excessive punitive damages, the award does not violate public policy.

## A

We first address the defendant's claim that the arbitrator's award of punitive damages violated its right to due process because the award was excessive. See generally *BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). The constitutional protections of individual rights and liberties extend only to government actions. *Edmonson* v. *Leesville Concrete Co.*, 500 U.S. 614, 619, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991); see also L. Tribe, American Constitutional Law (2d Ed. 1988) § 18.1, p. 1688. Since the civil rights cases; see *United States* v. *Stanley*, 109 U.S. 3, 4, 3 S. Ct. 18, 27 L. Ed. 835 (1883); the United States Supreme Court has maintained that, against private conduct, "however discriminatory or wrongful . . . the [f]ourteenth [a]mendment offers no shield." (Internal quotation marks omitted.) *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974). Therefore, in determining whether a claimant's due process rights have been violated, the threshold inquiry is whether the challenged conduct constitutes state action. This inquiry becomes quite complicated when, as in the present case, the actor is a private entity. See *Cremin* v. *Merrill Lynch Pierce*

could not have presented this claim to the arbitration panel. Therefore, both claims are properly before this court.

*Fenner & Smith, Inc.,* 957 F. Sup. 1460, 1468 (N.D. Ill. 1997) (citing cases). In such a case, the question becomes whether the conduct in question is "fairly attributable" to the state. *Lugar* v. *Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982).

The United States Supreme Court currently employs a two part test to determine whether the conduct of a private actor is fairly attributable to the state. "First, the deprivation must be caused by the exercise of some right or privilege created by the [s]tate or by a rule of conduct imposed by the [s]tate or by a person for whom the [s]tate is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Id. In order to determine whether the actor is a state actor, the court must consider: "the extent to which the actor relies on governmental assistance and benefits, see *Tulsa Professional Collection Services, Inc.* v. *Pope,* 485 U.S. 478 [108 S. Ct. 1340, 99 L. Ed. 2d 565] (1988); *Burton* v. *Wilmington Parking Authority,* 365 U.S. 715 [81 S. Ct. 856, 6 L. Ed. 2d 45] (1961); whether the actor is performing a traditional governmental function, see *Terry* v. *Adams,* 345 U.S. 461 [73 S. Ct. 809, 97 L. Ed. 1152] (1953); *Marsh* v. *Alabama,* 326 U.S. 501 [66 S. Ct. 276, 90 L. Ed. 2d 265] (1946); cf. *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm[ittee],* 483 U.S. 522 [544–45, 107 S. Ct. 2971, 97 L. Ed. 2d 427] (1987); and whether the injury caused is aggravated in a unique way by the incidents of governmental authority, see *Shelley* v. *Kraemer,* 334 U.S. 1 [68 S. Ct. 836, 92 L. Ed. 1161] (1948)." *Edmonson* v. *Leesville Concrete Co.,* supra, 500 U.S. 621–22. Applying these considerations to the present case, we conclude that the act of the Superior Court in confirming the arbitration award did not convert the arbitration award into state action.

The defendant does not argue that the arbitration panel relied on government assistance or benefits or

performed a traditional governmental function. Indeed, we can find no instance in which a claimant has relied on a claimed dependence by an arbitration panel on government assistance and benefits, and federal courts have consistently rejected the "traditional government function" argument as support for concluding that an arbitrator was a state actor. See *Davis* v. *Prudential Securities, Inc.*, 59 F.3d 1186, 1191 (11th Cir. 1995) (collecting cases). Instead, the defendant argues that the Superior Court's confirmation of the award rendered the decision of the arbitration panel state action because, in the absence of the judicial action, the award would be unenforceable. Therefore, the only *Edmonson* factor relevant to the present case is whether the judicial confirmation of the arbitration award constituted an incident of government authority that uniquely aggravated the defendant's claimed injury.

Because *Shelley* v. *Kraemer*, supra, 334 U.S. 1, is the principal case relied upon in any argument advocating that a private actor's conduct becomes state action based on the alleged aggravation of the claimed injury in a unique way by the incidents of governmental authority, it is helpful to review the factual and procedural background of that case.[8] *Shelley* involved a restrictive covenant, which was agreed to by white landowners, to exclude minorities from occupying any of the fifty-seven parcels of land that were subject to the covenant. Id., 4–5. The defendants in *Shelley* were persons of African-American descent who had purchased land from an owner of one of the subject parcels. Id., 5. The plaintiffs, owners of other parcels subject to the covenant, sued in state court, seeking a restraining order preventing the defendants from taking possession

---

[8] *Shelley* actually involved two separate cases, the second of which involved facts that were not materially distinct from the first case. *Shelley* v. *Kraemer*, supra, 334 U.S. 6. For ease of reference, we set forth only the facts of the first case.

of the land and seeking judgment divesting title from the defendants and revesting title with the immediate grantor or some other person as directed by the court. Id., 6. The trial court denied the requested relief on the ground that the agreement had never become final and complete because it was the intention of the parties to the agreement that it was not to become effective until signed by all the property owners, a condition that had never been realized. Id. The Supreme Court of Missouri reversed the judgment of the trial court, and held that the restrictive covenant was effective and did not violate any rights guaranteed to the defendants by the federal constitution. Id. The United States Supreme Court reversed, holding that judicial enforcement of a restrictive covenant constituted state action and that the covenant violated the defendants' rights under the equal protection clause of the fourteenth amendment. Id., 20. The court reasoned that the action of the judiciary was state action because "but for the active intervention of the state courts, supported by the full panoply of state power, [the defendants] would have been free to occupy the properties in question without restraint." Id., 19.

At first glance, judicial confirmation of an arbitration award fits the *Shelley* pattern perfectly. Judicial confirmation is indisputably an exercise of government authority. See id., 18 (actions of state courts and state officials are state action for purposes of fourteenth amendment). Furthermore, just as with the restrictive covenant in *Shelley*, the arbitration award at issue in the present case would have had no effect without the active intervention of the courts, "supported by the full panoply of state power . . . ." Id., 19. Therefore, the same "but for" reasoning that guided the analysis of the Supreme Court in *Shelley* would seem to compel the conclusion that the judicial confirmation of an arbitration award constitutes state action. *Shelley*'s prece-

dential authority for this proposition, however, at least outside the context of racially restrictive covenants, is at best questionable. Although praised as a landmark civil rights decision,[9] *Shelley* has also been the subject of much controversy and criticism.[10] Indeed, many com-

---

[9] S. Saxer, "*Shelley* v. *Kraemer*'s Fiftieth Anniversary: 'A Time for Keeping; a Time for Throwing Away?'" 47 U. Kan. L. Rev. 61, 83 (1998) (noting that "*Shelley* has been celebrated as an expansion of the state action doctrine which allows private discrimination to be restricted by constitutional norms"); L. Henkin, "*Shelley* v. *Kraemer*: Notes for a Revised Opinion," 110 U. Pa. L. Rev. 473 (1962) (noting that *Shelley* was "hailed as the promise of another new deal for the individual").

[10] S. Saxer, "*Shelley* v. *Kraemer*'s Fiftieth Anniversary: 'A Time for Keeping; a Time for Throwing Away?'" 47 U. Kan. L. Rev. 61, 83–84 (1998) (noting that *Shelley*'s expansion of state action doctrine has been criticized because of its potential to convert all private action to state action); see also P. Kurland, "The Supreme Court 1963 Term—Foreword: Equal in Origin and Equal in Title to the Legislative and Executive Branches of the Government," 78 Harv. L. Rev. 143, 148 (1964) (referring to *Shelley* as "constitutional law's *Finnegan's Wake*"); L. Graglia, "State Action: Constitutional Phoenix," 67 Wash. U. L.Q. 777, 788 (1989) (describing reasoning in *Shelley* as "disconcerting because it illustrates with stark clarity both the [c]ourt's belief and the truth that it is exempt from any requirement that its opinions make sense").

Moreover, *Shelley*'s critics worry about the consequences should *Shelley*'s reasoning be extended. For example, Professor Lawrence Tribe has opined that *Shelley*'s reasoning, if "consistently applied, would require individuals to conform their private agreements to constitutional standards whenever, as almost always, the individuals might later seek the security of potential judicial enforcement." L. Tribe, supra, 1697. One author proposes the following hypothetical: "[N]eighbors, in the absence of zoning regulations, could not stop the operation of an adult bookstore or a nude dancing establishment in their community either through the use of private covenants or nuisance law because such activities would be protected by the [f]irst [a]mendment." S. Saxer, supra, 47 U. Kan. L. Rev. 65. Another commentator indicates that the flaw of *Shelley* is that it is grounded on a fundamentally paradoxical principle: "that the state may properly be charged with . . . discrimination when it does no more than give effect to an agreement that the individual involved is, by hypothesis, entirely free to make." L. Henkin, "*Shelley* v. *Kraemer*: Notes for a Revised Opinion," 110 U. Pa. L. Rev. 473, 476 (1962). Finally, one author, in commenting on the expansive nature of *Shelley*'s conception of state action, notes that "*every* action engaged in by a private person is either compelled, prohibited, or permitted, i.e., authorized, by the legal system within which that person lives." (Emphasis added.) G. Buchanan, "A Conceptual History of the State Action Doctrine: The Search for Governmental Responsibility (Part II)," 34 Hous. L. Rev. 665, 724 (1997).

mentators speculate that the holding of *Shelley* has been effectively confined to its facts. See, e.g., G. Buchanan, "A Conceptual History of the State Action Doctrine: The Search for Governmental Responsibility (Part II)," 34 Hous. L. Rev. 665, 724 (1997).

A survey of subsequent United States Supreme Court cases that have discussed *Shelley* supports this conclusion. The court has criticized *Shelley* and expressed reservations about extending its holding, most expressly in *Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263, 266, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993), a case in which abortion clinics and other groups sought to enjoin antiabortion demonstrators from demonstrating at clinics in Washington, D.C. In responding to Justice Souter's concurring and dissenting opinion, the majority asserted that he had relied on *Shelley* for the proposition that during the sit-ins in the 1960's, "there *was*, even before the Civil Rights Act, legal warrant for the physical occupation." (Emphasis in original.) Id., 282 n.14. The majority then continued: "Any argument driven to reliance upon an extension of that volatile case is obviously in serious trouble." Id.

In addition to this direct criticism, the court's minimal reliance on *Shelley* as precedent evinces the court's reluctance to extend *Shelley*'s holding beyond the context of racial discrimination. Over the years, the Supreme Court has cited to *Shelley* primarily as a part of general language introducing the problem of state action, for the basic proposition that only state action is subject to fourteenth amendment strictures and that private action, no matter how discriminatory, is not subject to constitutional scrutiny.[11] More extensive dis-

---

[11] See, e.g., *Cuyahoga Falls* v. *Buckeye Community Hope Foundation*, 538 U.S. 188, 196, 123 S. Ct. 1389, 155 L. Ed. 2d 349 (2003); *United States* v. *Morrison*, 529 U.S. 598, 621, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000); *American Manufacturers Mutual Ins. Co.* v. *Sullivan*, 526 U.S. 40, 50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999).

cussions of *Shelley* generally have appeared in concurring, rather than majority, opinions. For example, in *Lombard* v. *Louisiana*, 373 U.S. 267, 268, 83 S. Ct. 1122, 10 L. Ed. 2d 338 (1963), three African-American students and one white student, who were sitting at a whites only lunch counter at a privately owned restaurant in New Orleans, were asked to leave. When the students refused, they were arrested and subsequently convicted of criminal mischief. Id., 269. The students challenged their convictions as violative of the fourteenth amendment. Although there were no city ordinances requiring segregation, the majority opinion of the Supreme Court found the requisite state action in the actions of the city officials, who had issued statements establishing a local custom of segregation. Id., 270–73. After a similar occurrence had taken place in the city one week earlier, the mayor of New Orleans stated, four days prior to the defendants' arrest, that he had instructed the superintendent of police that no additional sit-ins would be "permitted." Id., 269. The majority opinion interpreted this statement and others as having a coercive effect on private individuals. Id., 272–73. In his concurrence, however, Justice Douglas focused on the imposition of criminal penalties on the defendants by the Louisiana judiciary. Id., 278. Justice Douglas relied on *Shelley* to conclude that, independent of any actions of the executive, the judiciary's actions in imposing the penalties constituted sufficient evidence of state action. Id.

In *Bell* v. *Maryland*, 378 U.S. 226, 227, 84 S. Ct. 1814, 12 L. Ed. 2d 822 (1964), demonstrators who engaged in a sit-in at a privately owned restaurant were arrested for trespass. The Maryland Court of Appeals affirmed the convictions, and the Supreme Court granted certification. Id., 228. The Maryland legislature, however, subsequently passed a statute that made it unlawful for restaurants to deny service to a person because of his or her race. Id., 228–29. The majority, therefore,

reversed the convictions and remanded the case to the Maryland Court of Appeals for consideration of whether the convictions should be nullified in light of the supervening change of law. Id., 228. Justice Douglas in his concurring opinion, however, would have reached the merits of the case. Id., 242. Admonishing the majority for leaving the "resolution of the conflict to others," Justice Douglas stated that "[t]he [c]ourt was created to sit in troubled times as well as in peaceful days." Id., 243 (Douglas, J., concurring). In concluding that the actions of the judiciary, as well as other Maryland state actors, formed a sufficient basis for a finding of state action, he first noted that judicial action alone had been considered sufficient for a finding of state action in "cases involving the use of coerced confessions (e.g., *Chambers* v. *Florida*, 309 U.S. 227 [60 S. Ct. 472, 84 L. Ed. 716 (1940)]), the denial to indigents of equal protection in judicial proceedings (e.g., *Griffin* v. *Illinois*, 351 U.S. 12 [76 S. Ct. 585, 100 L. Ed. 891 (1956)]), and the action of state courts in punishing for contempt by publication (e.g., *Bridges* v. *California*, 314 U.S. 252 [62 S. Ct. 190, 86 L. Ed. 192 (1941)])." *Bell* v. *Maryland*, supra, 257 (Douglas, J., concurring). In *Bell*, he said, "Maryland's action against these Negroes was as authoritative as any case where the [s]tate in one way or another puts its full force behind a policy. The policy here was segregation in places of public accommodation; and Maryland enforced that policy with her police, her prosecutors, and her courts." Id. Likening the judicial action of the Maryland courts to that of the Missouri courts in *Shelley*, Justice Douglas asked, "Why should we refuse to let state courts enforce apartheid in residential areas of our cities but let state courts enforce apartheid in restaurants? If a court decree is state action in one case, it is in the other." Id., 259. He then added that the court should rely on *Shelley* in resolving the "restaurant cases," "holding

that what the [f]ourteenth [a]mendment requires in restrictive covenant cases it also requires in restaurants." Id.

Only once has a majority opinion discussed *Shelley* at any length—in order to distinguish it. *Evans* v. *Abney*, 396 U.S. 435, 436, 90 S. Ct. 628, 24 L. Ed. 2d 634 (1970), arose from a trust, created in his will by Senator A.O. Bacon of Macon, Georgia, leaving land to the city for use as a whites only park. The city initially operated the park according to Senator Bacon's devise, but after the Supreme Court decision in *Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), the city recognized that it could no longer constitutionally operate the park as segregated. *Evans* v. *Abney*, supra, 437. When the case came before the court for the first time, the city had been removed as a trustee and private trustees had been appointed. Id., 438. Nevertheless, in *Evans* v. *Newton*, 382 U.S. 296, 297–98, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966), the court ruled that the park had to be treated as a public institution regardless of who held title, and on remand, the Supreme Court of Georgia held that the trust failed because its purpose could no longer be fulfilled. *Evans* v. *Abney*, supra, 438–39. The Georgia court further concluded that the trust could not be saved by the doctrine of cy pres and that title in the land therefore reverted to the heirs. Id., 439. The petitioners, African-Americans who had intervened in the case, claimed that the decision of the state Supreme Court violated their rights to due process and equal protection under the fourteenth amendment. Id., 437. The Supreme Court affirmed the decision of the state court and concluded that there was no violation of the fourteenth amendment. Id., 446. In distinguishing this case from *Shelley*, the majority noted that "the effect of the Georgia decision eliminated all discrimination against Negroes in the park by eliminating the park itself, and the termination of the park

was a loss shared equally by the white and Negro citizens of Macon since both races would have enjoyed a constitutional right of equal access to the park's facilities had it continued." Id., 445. *Shelley*, on the other hand, involved "state judicial action which had affirmatively enforced a private scheme of discrimination against Negroes." Id. By contrast, Justice Brennan in his dissent emphasized the similarity between *Evans* and *Shelley*. "[T]his is a case of a state court's enforcement of a racial restriction to prevent willing parties from dealing with one another. The decision of the Georgia courts thus, under *Shelley* v. *Kraemer* [supra, 334 U.S. 1], constitutes state action denying equal protection." *Evans* v. *Abney*, supra, 457 (Brennan, J., dissenting). Justice Brennan's dissent, contrasted with the majority's reasoning, further emphasizes the reluctance of the court to extend *Shelley* beyond the realm of restrictive covenants to apply to any and all private agreements that are dependent on court enforcement in order to be effective.

Our conclusion that Supreme Court case law does not support the extension of *Shelley* to the context of the judicial confirmation of an arbitration award is further supported by the various state and federal courts that have considered whether state action exists under such circumstances. Almost universally, courts have concluded that judicial confirmation of an arbitration award is not sufficient to convert the action of an arbitrator into state action. For example, the Seventh Circuit Court of Appeals found no state action in a case where the plaintiff claimed that her right to equal protection had been violated because her arbitration panel contained no women. The court noted that arbitration is a "private self-help remedy." *Smith* v. *American Arbitration Assn., Inc.*, 233 F.3d 502, 507 (7th Cir. 2000). Moreover, it reasoned, "[t]he fact that the courts enforce [arbitration] contracts, just as they enforce

other contracts, does not convert the contracts into state or federal action and so bring the equal protection clause into play. . . . This is not *Shelley* v. *Kraemer* [supra, 334 U.S. 1], or *Marsh* v. *Alabama*, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946), cases in which the enforcement of private contracts had the effect of establishing private governments exercising governmental power under delegation from the state." *Smith* v. *American Arbitration Assn., Inc.*, supra, 507. Similarly, the Eleventh Circuit Court of Appeals concluded in *Davis* v. *Prudential Securities, Inc.*, supra, 59 F.3d 1186, that judicial enforcement of an arbitration award did not convert the award into state action. In *Davis*, as in the present case, the defendant claimed that an arbitrator's award of punitive damages violated the defendant's right to due process and that the judicial confirmation of the award necessitated a finding of state action. Id., 1191. In rejecting the defendant's argument, the Eleventh Circuit noted that "the holding of *Shelley* . . . has not been extended beyond the context of race discrimination." Id. In fact, the court reasoned, the Supreme Court had, since *Shelley*, narrowed the concept of state action, prompting other courts addressing the identical issue to decline to find state action based on *Shelley*'s reasoning. Id., 1192.

Other courts that have directly addressed this issue have arrived at the same conclusion. See, e.g., *Cremin* v. *Merrill Lynch Pierce Fenner & Smith, Inc.*, supra, 957 F. Sup. 1469 (court confirmation of arbitrators' decision was not state action); *United States* v. *American Society of Composers, Authors & Publishers*, 708 F. Sup. 95, 96–97 (S.D.N.Y. 1989) (mere court approval of arbitration was not state action); cf. *Glennon* v. *Dean Witter Reynolds, Inc.*, 1994 U.S. Dist. LEXIS 21081, *43–44 (M.D. Tenn. December 15, 1994) (question of whether judicial confirmation constitutes state action is moot because court will confirm only if it finds that arbitra-

tor's award does not violate constitutional rights); *Sawtelle* v. *Waddell & Reed, Inc.*, 304 App. Div. 2d 103, 109–10, 754 N.Y.S.2d 264 (2003) (recognizing that "there is ample authority for the proposition that a private arbitration does not implicate due process concerns since, where the parties have voluntarily participated in the arbitration process, there is no state action involved, not even in the judicial confirmation of the punitive damage award");[12] but see *Commonwealth Associates* v. *Letsos*, 40 F. Sup. 2d 170, 177 n.37 (S.D.N.Y. 1999) (criticizing *Davis* in dicta and noting that "[w]hile the procedures utilized in private arbitration do not constitute state action . . . the application of the coercive power of a court to confirm and enforce an arbitration award is arguably another matter" [citation omitted]); *In re Knepp* v. *Credit Acceptance Corp.*, 229 B.R. 821, 840–41 (Bankr. N.D. Ala. 1999) (following *Davis*, but criticizing opinion in dicta based on law review articles that claim that judicial confirmation of compelled arbitration can constitute state action); *Birmingham News Co.* v. *Horn*, 2004 WL 1293993, *37 (Ala. 2004) (distinguishing and criticizing *Davis*).

None of the cases relied upon by the defendant in arguing that the Supreme Court has repeatedly applied *Shelley*'s rule converting the conduct of a private actor into state action via judicial enforcement involves an application of the third *Edmonson* factor—that is, whether state action may be imputed to the conduct of a private actor because the claimed injury was aggravated in a unique way by the incidents of governmental authority. We discuss several of these cases by way of

---

[12] *Sawtelle*, while recognizing that the weight of authority supports the conclusion that judicial confirmation of an arbitrator's award does not constitute state action, concluded that *BMW of North America, Inc.* v. *Gore*, supra, 517 U.S. 559, was nevertheless applicable to a challenge to such an award, because *Gore* "provides a guide for determining whether such an award is irrational." *Sawtelle* v. *Waddell & Reed, Inc.*, supra, 304 App. Div. 2d 110.

illustration. For instance, one of the principal cases relied upon by the defendant, *New York Times* v. *Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), did not involve any attempt to impute state action to a private actor's conduct. The only state action question presented in that case was whether the Alabama courts' application of a state rule of law violated the petitioner's first and fourteenth amendment rights. Id., 265. Although a private actor had brought the civil action, the court did not consider whether the petitioner's action in bringing the lawsuit constituted state action or was converted to state action by the Alabama courts' judgment, because that issue was not presented in the case. In other words, it was not the petitioner's action in bringing the suit that constituted the injury, but the state court's ruling in favor of him. Thus, *Sullivan* is not analogous to the present case, wherein the claimed underlying injury resulted from the conduct of a private actor—the arbitration panel. Similarly, *Cohen* v. *Cowles Media Co.*, 501 U.S. 663, 668, 111 S. Ct. 2513, 115 L. Ed. 2d 586 (1991), which involved a private cause of action for promissory estoppel, simply followed *Sullivan* in holding that "the application of state rules of law in state courts in a manner alleged to restrict [f]irst [a]mendment freedoms constitutes 'state action' under the [f]ourteenth [a]mendment." Just as in *Sullivan*, in *Cohen*, the issue was not presented and the court did not address whether the conduct of a private actor was converted into state action by the actions of the court— the only question was whether the action of the court itself constituted state action. The other authorities relied upon by the defendant are also distinguishable. In *Lugar* v. *Edmondson Oil Co.*, supra, 457 U.S. 941–42, for example, the court premised its finding of state action, in the context of ex parte attachment of property, on the fact that the private actor at issue in that case acted "jointly" with the state—not on a finding

that the state authorized the private actor's conduct. Two other cases relied upon by the defendant, *Sniadach* v. *Family Finance Corp.*, 395 U.S. 337, 89 S. Ct. 1820, 23 L. Ed. 2d 349 (1969), and *Fuentes* v. *Shevin*, 407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972), both arose in the context of garnishment actions and prejudgment attachments, a specific line of cases that culminated in *Lugar*. Although the court did not, either in *Sniadach* or in *Fuentes* expressly ground its finding of state action on a "joint action" analysis, *Lugar* later characterized those cases as resting exactly on that theory in arriving at the conclusion that "whenever officers of the [s]tate act jointly with a creditor in securing the property in dispute," the state action requirement is met. *Lugar* v. *Edmondson Oil Co.*, supra, 932–33.

## B

The defendant next claims that the arbitration award violates Connecticut public policy against excessive punitive damage awards, grounded in Connecticut common law and in the constitution of the United States, as interpreted by *BMW of North America, Inc.* v. *Gore*, supra, 517 U.S. 559. The defendant further contends that this policy applies equally to judicial and arbitration awards. We disagree.

We begin with the applicable standard of review. It is undisputed that the submission to arbitration was voluntary and unrestricted.[13] Generally, "[w]hen the par-

---

[13] The arbitration clause of the parties' contract provides: "With the exception of seeking injunctive or other relief for violation of Confidential Information of a party pursuant to Section C above, any dispute arising [out] of or relating to this Agreement, including any issues relating to arbitrability or the scope of this arbitration clause, will be finally settled by arbitration in . . . accordance with the rules of the American Arbitration Association and the United States Arbitration Act and judgment upon the award rendered by the arbitrator(s) may be entered by any court with jurisdiction. The arbitration will be held in the Stamford, CT metropolitan area."

ties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement." (Internal quotation marks omitted.) *State* v. *New England Health Care Employees Union*, 271 Conn. 127, 134, 855 A.2d 964 (2004). "When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission." *Garrity* v. *McCaskey*, 223 Conn. 1, 4–5, 612 A.2d 742 (1992). "[W]here [however] a party challenges a consensual arbitral award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy." *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 429, 747 A.2d 1017 (2000). Because the defendant's claim has a legitimate, colorable basis, de novo review of the award is appropriate.

An arbitrator's award may be vacated if it violates clear public policy. *State* v. *New England Health Care Employees Union*, supra, 271 Conn. 134. This rule is an exception to the general rule restricting judicial review of arbitral awards. Id. The exception, however, is "narrowly construed and . . . is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Internal quotation marks omitted.) Id., 135–36. "Our view that public policy exceptions to arbitral authority should be narrowly construed finds support in . . . *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 44, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987), [where] the United States Supreme Court concluded that a policy

against the operation of dangerous machinery by persons under the influence of drugs or alcohol, while 'firmly rooted in common sense,' did not permit a court to set aside an arbitration award." *New Haven* v. *AFSCME, Council 15, Local 530*, 208 Conn. 411, 417, 544 A.2d 186 (1988). Therefore, the award must be "*clearly* illegal or *clearly* violative of a strong public policy." (Emphasis added; internal quotation marks omitted.) *State* v. *New England Health Care Employees Union*, supra, 135. Furthermore, "[t]he party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated." (Internal quotation marks omitted.) *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, 257 Conn. 80, 91, 777 A.2d 169 (2001).

Thus, in the face of a challenge to an arbitral award on public policy grounds, we engage in a two step process: First, we determine "whether an explicit, well-defined and dominant public policy can be identified." (Internal quotation marks omitted.) *State* v. *New England Health Care Employees Union*, supra, 271 Conn. 137. "If so, [we] then [decide] if the arbitrator's award violated the public policy."[14] (Internal quotation marks omitted.) Id.

---

[14] The dissent's argument, that our decision upholding the arbitrator's award violates the clearly defined public policy favoring arbitration, cannot survive this second prong of the public policy inquiry. Rather than demonstrate a violation of the public policy at issue, the dissent offers the following speculation: in light of our decision, parties will opt not to include arbitration clauses in their contracts. The dissent offers no evidence in support of this prediction and does not consider the more likely alternative—that is, that parties who are concerned about such a result will, instead, opt to include in arbitration clauses language that either caps or precludes punitive damages altogether, or subjects an arbitral punitive damages award to judicial review.

To put the point more generally, the dissent's argument is premised on the notion that parties engaged in negotiation over contract language will decide not to include an arbitration clause *at all*, because of the possibility that, in the event of a breach, the arbitration panel will render an excessive punitive damages award that a court will not be able to overturn on the basis of the public policy exception to the generally limited scope of judicial review of such awards. This assumption is wholly speculative. As we have stated, parties who are negotiating over contractual terms—including

We have been wary about vacating arbitral awards on public policy grounds because "implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule." *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, 255 Conn. 800, 815, 770 A.2d 14 (2001).

We have looked to a variety of sources in determining whether an arbitral award violates a well-defined public policy, and have cited, as examples of possible sources, statutes, administrative decisions and case law. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 428. In those cases in which we have vacated an arbitral award on public policy grounds, the public policy has most commonly been grounded in the General Statutes. Rather than requiring that public policy be grounded on a particular type of source, however, in determining whether a party has satisfied its

whether to incorporate an arbitration clause—will be able to negotiate over the terms of that clause as well. There is absolutely no reason to assume that, if they want to include an arbitration clause in their contract, they will find it impossible to negotiate whatever limits they deem appropriate on the scope of the arbitrators' powers, and of judicial review of the exercise of those powers, including the potential for an excessive award of punitive damages.

Moreover, we believe it relevant that the astronomical awards envisaged by the dissent, although theoretically possible, are very unlikely. Simply because we can *conceive* of an arbitration award of the magnitude hypothesized by the dissent, does not mean that such an award is likely to occur. We ought not to make rules of law based on unrealistic hypotheses.

Thus, the fact that the dissent's entire public policy argument rests on speculative consequences makes evident that it fails to " 'clearly [demonstrate]' " a violation of the public policy. *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, 257 Conn. 80, 91, 777 A.2d 169 (2001). Specifically, we have stated that "[t]he public policy exception applies only when the award is clearly illegal or *clearly* violative of a strong public policy." (Emphasis added; internal quotation marks omitted.) *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 265 Conn. 771, 783, 830 A.2d 729 (2003). We have never found a clear violation of a public policy premised on a purely speculative result and decline to do so now.

burden of demonstrating the existence of a well-defined public policy, we have instead focused our inquiry on whether the alleged public policy is in fact clearly discernible in the purported source. Because they establish the illegality of an act, criminal statutes often provide a clear basis for a public policy. For example, in *Groton v. United Steelworkers of America*, 254 Conn. 35, 36–37, 757 A.2d 501 (2000), we affirmed the trial court's decision vacating an arbitration award that reinstated employment of an employee who had been convicted of embezzlement of his employer's funds following a plea of nolo contendere because the award had violated the public policy against embezzlement found in General Statutes § 53a-119 (1), which criminalizes embezzlement by defining it as a type of larceny. The public policy against embezzlement, we held, "encompasse[d] the policy that an employer may not be required to reinstate the employment of one who has been convicted of embezzlement of his employer's funds, whether that conviction follows a trial, a guilty plea, or a plea of nolo contendere." Id., 46–47. We also found a dominant and clearly defined public policy in *State v. AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 472–73, 747 A.2d 480 (2000), where we affirmed the trial court's decision to vacate an arbitration award that had ordered the reinstatement of a correction officer who had been convicted of harassment under General Statutes § 53a-183 (a), for placing an anonymous, obscene and racist telephone call to a state legislator from a correctional facility telephone while he was on duty because the award had violated the public policy against harassment as expressed in the statute.

We have also found public policy clearly defined in noncriminal statutes. For instance, in *Board of Trustees v. Federation of Technical College Teachers*, 179 Conn. 184, 187, 425 A.2d 1247 (1979), we affirmed the trial court's decision to vacate an arbitration award that had

ordered, pursuant to provisions of a collective bargaining agreement between the union and the plaintiff board of trustees for state technical colleges, that full-time faculty members employed by the board who worked 171 days per year were entitled to accrue fifteen days of sick leave per year. We concluded that the award violated the public policy codified in General Statutes § 5-247 (a) that those faculty members were entitled to only twelve and one-half sick days per year. Id., 194. In *State* v. *New England Health Care Employees Union*, supra, 271 Conn. 138, we held that General Statutes §§ 17a-238 (b) and (e), 17a-247b (a) and 17a-247c (a) established a clearly defined and dominant public policy of protecting department of mental retardation clients from mistreatment, and that the policy was not violated when an arbitrator ordered the reinstatement of an employee who was found to have abused a client.

Statutes have not been the exclusive source from which we have found clear statements of public policy. We also have looked to city charters and, on one occasion, to the Rules of Professional Conduct. In *Waterbury Teachers Assn.* v. *Furlong*, 162 Conn. 390, 423, 294 A.2d 546 (1972), we concluded that a city charter provision provided a sufficient basis to establish a well-defined and dominant public policy. In that case, we affirmed the trial court's decision to vacate an arbitration award limiting a teacher's contribution to the retirement system to 1 percent of her pay in accordance with the union contract. Id., 425. We grounded our decision on § 2731 of the Waterbury charter, which provided in relevant part: "The rate of contributions to be made by a teacher participant of the retirement system shall be *three percent* of pay." (Emphasis added; internal quotation marks omitted.) Id., 422. We agreed with the trial court's conclusion that the award had violated a clearly stated public policy. Id., 425. In *Schoonmaker*

v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 416, we looked to the Rules of Professional Conduct as the source for public policy. In that case, we concluded that an arbitrator's finding that the plaintiff had forfeited his right to postemployment benefits by practicing law in violation of a noncompetition provision in a partnership agreement did not violate the public policy of facilitating clients' access to an attorney of their choice embodied in rule 5.6 of the Rules of Professional Conduct. Id., 418. In analyzing rule 5.6 to discern the nature of the implicated policy, we focused on "the purpose of the rule, its express language, and the manner in which courts in other jurisdictions have applied its restriction." Id., 438. On the basis of that analysis, we concluded that the purpose of the rule was to ensure clients the freedom of counsel of their choice. Id.

In other cases, we have found that the statute relied upon as a ground for the alleged public policy was too tenuously related to the subject matter to constitute a ground for a clearly defined and dominant public policy. For example, in *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, supra, 257 Conn. 81–82, we concluded that the state did not meet its burden of proving that an arbitration award that granted overtime pay to staff attorneys for the commission on human rights and opportunities violated what the state claimed was a clear public policy of prohibiting professional employees from receiving overtime compensation. In arguing for the existence of the public policy, the state pointed to the Federal Fair Labor Standards Act, 29 U.S.C. § 213 (a) (1), and the related state statute, General Statutes § 5-245 (b). *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, supra, 90–92. We concluded that the purpose of those statutes is violated when workers are paid less than the amount set forth therein, and that employers do not violate the purpose of the statutes

by providing employees with greater benefits than those required. Id., 93–94. In another case, *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, supra, 255 Conn. 802, we reversed the Appellate Court's judgment vacating an arbitral award and disagreed that the award, which ordered the plaintiff town to reinstate a union member to his position as a police officer for the town, violated "the specific public policy of a town's control over the fitness for duty of its police force . . . ." (Internal quotation marks omitted.) We concluded that General Statutes §§ 7-274, 7-276 and 7-294d (a) (10), or § 7-294e-16 (j) of the Regulations of Connecticut State Agencies, all of which establish a town's authority to establish a board of police commissioners and set entry level requirements for town officers, provided a sufficient basis to establish the purported public policy. Id., 813–15. In analyzing the various statutes and regulations, we concluded that they did not establish an explicit public policy that "a town has control over *termination* for fitness for duty of a police officer such as [the officer who had been terminated]." (Emphasis added.) Id., 819.

Thus, our case law establishes that, although we have been willing to find a public policy grounded in a variety of sources, the party seeking to establish the public policy bears a heavy burden of showing the existence of such a well-defined and dominant public policy. Indeed, we have in the past found a clear statement of that policy in some objectively stated form, such as a statute, city charter or rule of professional conduct. Although we do not decide that a statement in such a form is *always* required as the predicate for the public policy exception, we nonetheless adhere to the principle that the public policy must be "explicit, well defined and dominant . . . ." (Internal quotation marks omitted.) *State* v. *New England Health Care Employees Union*, supra, 271 Conn. 137.

Applying these principles to the present case, we conclude that the defendant has failed to sustain its burden of establishing that the arbitration panel's award violated a clearly demonstrated Connecticut public policy against excessive damage awards. In fact, the only statute relevant to the arbitration panel's award of punitive damages supports the opposite conclusion. The award was based on the panel's finding that the defendant violated CUTPA, which expressly allows the award of punitive damages, and does not, by its express terms, provide a cap on the amount of damages awarded. See General Statutes § 42-110g (a).[15]

---

[15] The defendant argues that the absence of a limit on punitive damages awards in CUTPA must be read against the backdrop of the public policy established by the common law of this state against excessive punitive damage awards. Because we conclude that our case law does not establish a well-defined and dominant public policy against such awards, we reject this contention.

Moreover, we disagree with the dissent that, based on previous court awards pursuant to § 42-110g (a), we should infer that this is an implied limit on punitive damages awarded under CUTPA. Even if we were to agree that such a limit might be inferred in a case involving a judicial action based upon CUTPA, a question we do not reach, such an inference would be insufficient to support a clear, well-defined and dominant public policy against the imposition of excessive punitive damages in a private, consensual arbitration proceeding. The mere fact that the dissent must rely on the past practices of the trial court to *infer* such an implied limit on the punitive damages provision of CUTPA, at the same time that it recognizes that other statutes expressly provide for limits on punitive damages, supports our conclusion that our precedents are insufficient to establish a clear, well-defined and dominant public policy against excessive punitive damages. Put another way, it is counterintuitive to suggest that there is a clear, well-defined and dominant public policy that may be identified only by inference from a small sample of trial court cases and other precedents that neither expressly state nor clearly imply that they rest on such a policy.

This does not mean, and we do not decide, that *any* arbitral award of punitive damages, no matter how grossly excessive, is insulated from judicial review. We can conceive that there may be such a grossly excessive award that the court would be justified in vacating it on the basis of the arbitrators' evident partiality; see General Statutes § 52-418 (a) (2); or manifest disregard of the law. The defendant does not claim on appeal, however, that this award fits either of those criteria.

We also disagree with the dissent that our decision necessarily means that an excessive compensatory damage award will be unreviewable under

The defendant contends that *BMW of North America, Inc.* v. *Gore,* supra, 517 U.S. 559, establishes a public policy against excessive punitive damage awards. In *Gore,* the United States Supreme Court concluded that a *jury award* of punitive damages, which, after remittitur, was $2 million, was grossly excessive in violation of the defendant's right to due process. Id., 567, 574–75. The court in *Gore,* however, was concerned only with whether the due process clause of the fourteenth amendment barred a *state* from imposing grossly excessive punitive damages on a tortfeasor. Id., 562. Therefore, the decision was premised on the presence of state action, an element we have already found lacking under the factual circumstances of the present case. Thus, although *Gore* supports a finding of a public policy against the imposition of grossly excessive punitive damages by the state, an issue we do not address in this opinion, it cannot serve as a basis for concluding that Connecticut has a public policy against the imposition of excessive punitive damages by a private actor, such as an arbitration panel.[16]

The second source advocated by the defendant as a ground for demonstrating a public policy against exces-

the public policy exception. That is a question that has not been presented, briefed or argued before us.

[16] The dissent contends that, regardless of *Gore*'s application solely to state action, we should infer from that case a clear and well-defined, dominant public policy against excessive punitive damages in general, and conclude that the award in the present case violates that public policy. Although we agree with the dissent that the constitution may be a source of public policy in an appropriate case, we disagree with the application of *Gore* for that purpose in the present case. Were we to draw such an inference, we would render meaningless *Gore*'s own stated limitation of its application to state actors by circumventing the state action requirement. Moreover, the same reasoning employed by the dissent would be applicable to other due process protections as well, including procedural due process, thus paving the way for constitutionalizing a wide variety of private conduct through public policy analysis. We decline to countenance this indirect imposition of constitutional norms on private actors.

sive punitive damage awards is the state's common law. We have not found, however, and the defendant has not produced, any decision or line of decisions clearly demonstrating the existence of a well-defined and dominant public policy against the imposition of excessive punitive damages. Instead, the defendant attempts to glean the public policy from various principles established by our case law and court practices, such as: a reviewing court's authority to overturn a jury award as excessive; see *Gray* v. *Fanning*, 73 Conn. 115, 117, 46 A. 831 (1900); a court's power to reduce the amount of a jury award; Practice Book § 17-3; the prohibition against jury awards of punitive damages; *Hanna* v. *Sweeney*, 78 Conn. 492, 494, 62 A. 785 (1906); the limitation, in cases of wilful or wanton misconduct, of punitive damages to attorney's fees, to the exclusion of traditional punitive damages; *Bodner* v. *United Services Automobile Assn.*, 222 Conn. 480, 492, 610 A.2d 1212 (1992) (citing general rule that "common law punitive damages . . . in Connecticut are limited to the plaintiff's attorney's fees and nontaxable costs"); and the rule prohibiting penalty clauses in contracts, but permitting liquidated damages clauses. *Norwalk Door Closer Co.* v. *Eagle Lock & Screw Co.*, 153 Conn. 681, 686, 220 A.2d 263 (1966).

Although all of these rules evince a generalized concern with limiting damage awards, the cases and practices cited by the defendant fail to satisfy its heavy burden of demonstrating a well-defined and dominant public policy against excessive punitive damages. Put another way, we simply fail to find in the combination of general limitations on damage awards in courts, the kind of well-defined and dominant public policy against excessive punitive damages that would justify setting aside a private, consensual arbitration award on the

basis of the stringent and narrow confines of the public policy exception.[17]

## II

In the second appeal in this case, the plaintiff contends that the trial court abused its discretion in denying its motion for prejudgment and postjudgment interest. We disagree. The following additional facts are relevant to our consideration of the plaintiff's claim.

At the time that the plaintiff applied for confirmation of the arbitration award, it also requested prejudgment interest pursuant to General Statutes § 37-3a.[18] The trial court confirmed the arbitration award, but did not rule on the plaintiff's request for prejudgment interest. Subsequently, the plaintiff filed a motion seeking both prejudgment interest pursuant to § 37-3a and postjudgment interest pursuant to General Statutes §§ 37-3a and 52-421 (b).[19] In a later ruling, the court denied the plaintiff's motion for prejudgment and postjudgment interest on the ground that the defendant's arguments in support of its motion to vacate the arbitration award were not frivolous. Subsequently, the court denied the plaintiff's motion to open the judgment with respect to postjudgment interest.

[17] Thus, we disagree with the dissent that the rule, originating in *Hanna* v. *Sweeney*, supra, 78 Conn. 494, limiting punitive damages at common law to attorney's fees and the costs of litigation is sufficient to establish a clear, well-defined and dominant public policy against excessive punitive damages generally. To reiterate what we stated previously, it is counterintuitive to suggest that there is a clear, well established and dominant public policy that may only be identified by inference and implication from common-law precedents that neither expressly state nor clearly imply that they are based on such a policy.

[18] General Statutes § 37-3a (a) provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ."

[19] See footnote 6 of this opinion.

The plaintiff argues that, because the purpose of arbitration is to provide speedy resolution of disputes, the deference generally accorded to a trial court's determination regarding prejudgment and postjudgment interest should not be adhered to in the context of an arbitration award. We disagree.

The decision of whether to grant interest under § 37-3a is "primarily an equitable determination and a matter lying within the discretion of the trial court." (Internal quotation marks omitted.) *O'Hara* v. *State*, 218 Conn. 628, 643, 590 A.2d 948 (1991). "In determining whether the trial court has abused its discretion, we must make every reasonable presumption in favor of the correctness of its action. . . . The court's determination regarding the award of interest should be made in view of the demands of justice rather than through the application of any arbitrary rule. . . . Whether interest may be awarded depends on whether the money involved is payable . . . and whether the detention of the money is or is not wrongful under the circumstances." (Citation omitted; internal quotation marks omitted.) *Bower* v. *D'Onfro*, 45 Conn. App. 543, 550–51, 696 A.2d 1285 (1997).

The trial court cited as its primary reason for denying the plaintiff's motion for interest pursuant to § 37-3a that the defendant had not wrongfully withheld the money because its arguments in opposition to the application to confirm the award and in support of its motion to vacate the award were not frivolous. This was an appropriate equitable consideration within the discretion of the trial court. The trial court's decision, therefore, was not an abuse of discretion.

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and KATZ, PALMER and VERTEFEUILLE, Js., concurred.

ZARELLA, J., with whom NORCOTT, J., joins, dissenting. I agree with the majority insofar as it holds that the judicial confirmation of an arbitration award does not constitute state action. I disagree with and am perplexed by the majority's conclusion in part I B of its opinion that this state does not have a well-defined and dominant public policy against excessive punitive damage awards. In my view, such a policy is evident in case law that spans nearly a century and is a foundational principle of any dispute resolution system, including arbitration. Because I believe that a $5 million punitive damage award under the circumstances of this case not only violates that policy, but also undermines the equally well settled policy encouraging arbitration as an efficient method of dispute resolution, I respectfully dissent.

I set forth an expanded rendition of the facts in order to place the issues posed by this case in their proper context. In 1994, Andrew Bronfman, an attorney, and Andrew Fineberg, a real estate professional, decided to embark on a business venture that they believed would be highly lucrative. They planned to sell subscriptions for physician, hospital and other medical services to persons located throughout the country who otherwise would not have access to health insurance at reasonable rates. In order to execute that vision, Bronfman and Fineberg formed MedSaver Health Programs, Inc., the predecessor to the plaintiff, MedValUSA Health Programs, Inc., and, in 1998, entered into an agreement with the defendant, MemberWorks, Inc., which provides membership programs that offer consumer discounts on a variety of products and services in the health care, finance and entertainment industries. Pursuant to that agreement, the defendant was to assemble networks of physicians, hospitals and other health care providers that would render services to the plaintiff's targeted constituencies at preferred rates. The agreement also

obligated the defendant to deliver to the plaintiff certain marketing and fulfillment materials,[1] and to provide support services to the plaintiff's customers and sales force. Although both parties invested a substantial amount of time and energy in the venture, the defendant never was able to establish networks and to deliver related materials and services that were satisfactory to the plaintiff.

In May, 2000, the plaintiff closed its business and thereafter filed a demand for arbitration, claiming in counts one and two, respectively, that the defendant had breached the parties' contract and the implied duty of good faith and fair dealing. The plaintiff also alleged in count three that the defendant had engaged in unfair and deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The plaintiff sought compensatory damages, attorney's fees and punitive damages pursuant to CUTPA, interest and costs.

In the proceedings before the arbitration panel, the plaintiff argued that the defendant's failure to perform its contractual obligations was not solely the result of ineptitude, but also was the product of a calculated, deliberate plan to undermine the plaintiff's business and to usurp the plaintiff's visionary business concept for its own benefit. The plaintiff asserted that the defendant's actions caused it to lose approximately $39.8 million in lost profits and sought compensatory damages in that amount. The plaintiff further argued that certain of the actions that gave rise to the compensatory damage claim also warranted a "substantial" punitive damage award under CUTPA. The plaintiff, however, did not suggest to the arbitrators an appropriate dollar

---

[1] Fulfillment materials included membership cards and information produced for the benefit of the plaintiff's members. See footnote 4 of the majority opinion.

amount for that award, nor did it articulate the legal standard by which it should be measured.

The defendant responded that, as of October, 1999, it had substantially fulfilled its obligations under the terms of the parties' agreement. It claimed that the plaintiff's lack of success was not due to its action or inaction but, instead, was attributable to the plaintiff's failure to mobilize its business and to provide a sufficient infrastructure to support a national sales effort. Indeed, during the course of the arbitration proceedings, Fineberg admitted that the plaintiff had not hired any employees, entered into binding contracts with independent contractors, secured office space or advertised its product in any substantial way.

The arbitration panel found in favor of the plaintiff on all counts but did not award any compensatory damages because the plaintiff "[had] not established them with reasonable certainty."[2] Notwithstanding the absence of any proved actual damages, the panel awarded the plaintiff $5 million in punitive damages in connection with the defendant's violation of CUTPA. Although the arbitration panel did not cite the legal standards upon which it relied in determining the amount of the award, it noted several incidents of unfair and deceptive acts that, in its view, justified such a result. These incidents, which are summarized aptly by the majority, included: "(1) the failure to disclose to the plaintiff the nature of its communications with [the original provider network], some of which called into question the availability of that network for the plaintiff's enterprise; (2) the failure to disclose to the plaintiff the availability of other networks; (3) a history of misrepresenting its obligations to the plaintiff under the contract; (4) the refusal to meet with the plaintiff in a timely manner and the unavailability of one of its employees for conference

---

[2] In fact, the arbitration panel did not award even nominal damages.

calls; (5) the failure to inform the plaintiff about the elimination of free dental services from the program and its inadequate responses to the plaintiff's request for information . . . (6) the failure to provide the plaintiff with new fulfillment materials necessitated by that elimination; (7) the failure to approve in a timely manner hospital lists for advertising; (8) an insistence that all communications with the plaintiff be in writing; and (9) the preparation and distribution of an inaccurate summary of a meeting with the plaintiff."

On appeal to this court, the defendant contends that the $5 million award violates the state's public policy against excessive punitive damages that is deeply rooted in the common law of this state and the United States constitution. I agree.

For nearly 100 years, this court has adhered to the rule first announced in *Hanna* v. *Sweeney*, 78 Conn. 492, 494–95, 62 A. 785 (1906), that punitive damages under the common law are limited to attorney's fees and other litigation expenses. In adopting that rule, we recognized that the traditional common-law doctrine affords a jury unfettered discretion to award damages that not only compensate the plaintiff for his or her injury, but also punish the wrongdoer. See id., 493–94. Although we observed that the traditional rule prevailed in most jurisdictions, we nonetheless declined to embrace it, noting that it was at odds with "the general rule of compensation in civil cases . . . ." Id., 494. Instead, we concluded that punitive damages awarded to a plaintiff in this state must be limited to "expenses of litigation in the suit, less . . . taxable costs." Id.

Nearly eighty years later, we reaffirmed our commitment to the common-law rule in *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, 193 Conn. 208, 477 A.2d 988 (1984). The plaintiff in that case had urged this court to abandon our conservative measure

and "join the majority of jurisdictions [that] permit an amount of 'punitive' damages which serves to 'punish and deter' wrongdoers who act wantonly and recklessly." Id., 235. In declining that invitation, we observed that "[v]arious authorities have discussed the many facets of the propriety of punitive damages and their measure in civil cases and have offered conflicting views." Id., 237. We noted that, "[a]lthough various justifications, such as the elements of deterrence and punishment, have been offered in favor of the availability of punitive damages . . . [c]ountless cases remark that such damages have never been a favorite in the law. . . . Typically, those who disfavor punitive damage awards in civil cases point to the prospect that such damages are frequently the result of the caprice and prejudice of jurors, that such damages may be assessed in amounts which are unpredictable and bear no relation to the harmful act, and that the prospect of such damages assessed in such a manner may have a chilling effect on desirable conduct." (Citation omitted; internal quotation marks omitted.) Id.

We further explained that, "[i]n permitting awards of punitive damages, but limiting such damages as we do, our rule strikes a balance—it provides for the payment of a victim's costs of litigation, which would be otherwise unavailable to him, while establishing a clear reference to guide the jury fairly in arriving at the amount of the award." Id. We also stated that, "although our rule is a limited one, when viewed in light of the ever rising costs of litigation, [it] does in effect provide for some element of punishment and deterrence in addition to the compensation of the victim. Thus, in limiting punitive damage awards to the costs of litigation less taxable costs, our rule fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion

by a jury." Id., 237–38. Eight years later in *Berry* v. *Loiseau*, 223 Conn. 786, 825, 614 A.2d 414 (1992), we once again affirmed our continued adherence to that rule. Thus, for nearly a century, we have remained steadfast in our commitment to a common-law measure of punitive damages that is indisputably one of the most conservative in the nation.

Against this common-law backdrop, the legislature has authorized punitive damage awards for certain causes of action. These statutes fall into three categories: (1) those that limit the amount of the award to no more than two times the actual damages incurred;[3] (2) those that designate a specific, albeit modest, dollar limit for such awards;[4] and (3) those that authorize punitive damages, but leave the amount of the award to the discretion of the court.[5] The provision of CUTPA at issue in the present case, namely, General Statutes § 42-110g (a), is of the latter type. It provides that "[t]he

[3] E.g., General Statutes § 35-53 (b) (punitive damage awards limited to amount equal to twice actual loss realized from wilful and malicious misappropriation of trade secrets); General Statutes § 52-240b (in product liability action, punitive damages must "not . . . exceed an amount equal to twice the damages awarded to the plaintiff").

[4] E.g., General Statutes § 46a-89 (b) (2) (punitive damages limited to $50,000 for discriminatory practice related to rental or sale of dwelling or commercial property or in provision of public accommodations); General Statutes § 46a-98 (d) (punitive damages limited to "the lesser of five thousand dollars or one per cent of the net worth of the creditor" for discriminatory credit practices); General Statutes § 52-564a (a) (3) (in civil action based on defendant's act of shoplifting, merchant may recover no more than $300 in punitive damages).

[5] E.g., General Statutes § 16-8d (b) (in action brought by employee alleging retaliation for disclosure of substantial misfeasance, malfeasance or nonfeasance in management of, inter alia, public service company, court "may award punitive damages"); General Statutes § 19a-550 (e) ("punitive damages may be assessed" in civil action in which there is finding of wilful or reckless deprivation of rights under patients' bill of rights); General Statutes § 31-51q (authorizing punitive damage awards against employers who wrongfully discharge or discipline employees for exercising their constitutional rights); General Statutes § 36a-618 (authorizing punitive damages against loan brokers who violate certain banking laws).

court may, in its discretion, award punitive damages . . . ." General Statutes § 42-110g (a).

The legislature enacted CUTPA in order to eliminate or to discourage "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). Recognizing that the attorney general is hampered in his enforcement efforts by limited staffing, the legislature, in its design of the statutory scheme, sought "to create a climate in which private litigants help to enforce the ban on [such] practices or acts." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 618, 440 A.2d 810 (1981). In order to advance that objective, the statute affords a plaintiff who establishes CUTPA liability "a remedy [that is] far more comprehensive than the simple damages recoverable under common law." Id., 617. Specifically, a plaintiff may recover both costs and attorney's fees; General Statutes § 42-110g (d); and punitive damages. General Statutes § 42-110g (a). Accordingly, punitive damages under CUTPA are not intended merely to compensate the plaintiff for the harm caused by the defendant but, rather, serve a broader, twofold purpose. First, they foster private enforcement of unfair trade practices by providing a reasonable incentive to litigate. See *Hinchliffe* v. *American Motors Corp.*, supra, 617–18. Second, they deter the defendant and others from engaging in future violations of CUTPA. See, e.g., *Tingley Systems, Inc.* v. *Norse Systems, Inc.*, 49 F.3d 93, 96 (2d Cir. 1995). Viewed in this light, punitive damages under CUTPA implicate public policy concerns because they are designed to protect and to vindicate the public interest. See *Freeman* v. *Alamo Management Co.*, 221 Conn. 674, 679, 607 A.2d 370 (1992).

The legislature did recognize, however, that the absence of a definitive standard for measuring punitive damages under CUTPA could give rise to excessive

awards. In order to safeguard against that risk, the legislature vested the authority to make such awards in the court, rather than in the jury; General Statutes § 42-110g (a) and (g); presumably because it believed that a court would be more likely to fix punitive damages at amounts that are reasonable and consistent with the policy goals of the statute.

Although this court never has articulated a formula for measuring punitive damages under CUTPA, awards made in past cases traditionally have been modest. See *Sawtelle* v. *Waddell & Reed, Inc.*, 304 App. Div. 2d 103, 112, 754 N.Y.S.2d 264 (2003) (surveying punitive damage awards under CUTPA and noting that "the awards range from $250 to $450,000" [internal quotation marks omitted]). Notably, the Second Circuit Court of Appeals recently has observed that the largest punitive damage award under CUTPA for "solely economic loss without allegations of pattern and practice [was] approximately $340,000." *Fabri* v. *United Technologies International, Inc.*, 387 F.3d 109, 126 (2d Cir. 2004), citing *Advanced Financial Services, Inc.* v. *Associated Appraisal Services, Inc.*, 79 Conn. App. 22, 33, 830 A.2d 240 (2003). Our research confirms that finding. Thus, not only does our common law evince a conservative public policy stance toward punitive damages; see *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, supra, 193 Conn. 237–38; *Hanna* v. *Sweeney*, supra, 78 Conn. 494–95; so, too, does the line of decisions upholding punitive damage awards under CUTPA. See *Sawtelle* v. *Waddell & Reed, Inc.*, supra, 304 App. Div. 2d 112–14 (surveying cases). Unlike the majority, I believe that the foregoing case law clearly implies the existence of a well-defined and dominant public policy against the imposition of excessive punitive damages.

In *BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 585–86, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996), the United States Supreme Court concluded that grossly

excessive punitive damage awards violate the due process clause of the fourteenth amendment to the United States constitution. The plaintiff in *Gore* brought an action against BMW of North America, Inc. (BMW), among others, under Alabama's fraud statute after he discovered that the new car that he had purchased from BMW had been damaged and repainted prior to delivery. Id., 563. The jury awarded him $4000 in compensatory damages and $4 million in punitive damages; id., 565; the latter of which subsequently was reduced to $2 million by the Alabama Supreme Court. Id., 567. On appeal to the United States Supreme Court, however, that court held that the $2 million award was "grossly excessive," and, therefore, a violation of due process, because BMW did not have fair warning that its misconduct could spawn such a severe penalty. Id., 574–75. In reaching that result, the court evaluated the award against three guideposts: (1) "the degree of reprehensibility of the defendant's conduct"; id., 575; (2) the "ratio [of punitive damages] to the actual harm inflicted on the plaintiff"; id., 580; and (3) the difference between "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct . . . ." Id., 583.

The defendant contends that *Gore* is relevant to its public policy argument because it is based on fundamental notions of fairness and fair warning that, together with the common law, "forge a strong public policy for placing substantive limits on awards of punitive damages." In other words, if an award is so large that it would violate the constitution if issued by a court of law, then we also should conclude that such an award contravenes public policy when it is made by an arbitration panel. Although I believe that Connecticut's public policy is even more restrictive than the limitations set forth in *Gore*, I agree with the defendant that, at a minimum, the state disfavors any punitive damage

award that is so large that it "offends [e]lementary notions of fairness [and notice as] enshrined in [federal] constitutional jurisprudence . . . ." Id., 574. In reaching that conclusion, I do not hesitate to embrace constitutional principles as a source of public policy when, as in the present case, it makes sense to do so because, as the defendant notes, "[i]t is difficult to conceive of a more elemental point of origin for public policy than the nation's constitutional guarantees."[6]

The majority rejects this argument, however, concluding that "[t]he court in *Gore* . . . was concerned only with whether the due process clause of the fourteenth amendment barred a *state* from imposing grossly excessive punitive damages on a tortfeasor. . . . Thus, although *Gore* supports a finding of a public policy against the imposition of grossly excessive punitive damages by the state . . . it cannot serve as a basis for concluding that Connecticut has a public policy against the imposition of excessive punitive damages by a private actor, such as an arbitration panel." (Citation omitted; emphasis added.) In providing such an abbreviated response to the defendant's argument, the majority fails to consider the broader import of *Gore* in the context of this case and disregards the impact of its decision on another equally important policy, namely, that favoring arbitration as an efficient and economic system of dispute resolution.

In its public policy argument, the defendant does not contend that *Gore* is relevant to this case because the substantive due process guarantees of the United States constitution apply to the arbitral forum. Rather, the defendant invokes the underlying principles of *Gore* in support of its claim that any punitive damage award

---

[6] See, e.g., *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 585, 693 A.2d 293 (1997) (recognizing that public policy can trace its roots to constitutional provisions).

that is so grossly excessive that it does not satisfy even the minimal constitutional standards of fairness and notice violates public policy irrespective of the forum in which it is issued. I agree with the defendant for the reasons set forth previously and further note that the same principles of fairness and notice that the United States Supreme Court relied on in finding a due process violation in *Gore* also apply in the context of arbitration, even though they are rooted in a different doctrine. In particular, they are inherent in the basic principle of contract law that damages arising from any contract, including one to arbitrate disputes, must be within the reasonable contemplation of the parties when they enter into the contract. See *Garrity* v. *McCaskey*, 223 Conn. 1, 11, 612 A.2d 742 (1992) ("although the discretion conferred on the arbitrator by the contracting parties is exceedingly broad, modern contract principles of good faith and fair dealing recognize that even contractual discretion must be exercised for purposes reasonably within the contemplation of the contracting parties"). A punitive damage award can be within the contemplation of the parties only if they had fair warning of it when they entered into the agreement to arbitrate. Despite these parallel concepts, the majority, while conceding that a grossly excessive punitive damage award that offends the fairness and notice principles of *Gore* would violate public policy if issued by a court of law, concludes that the same award rendered by an arbitration panel would not. That simply does not make sense to me because the latter award provides no more notice and is no less unfair than the former. Thus, in limiting its analysis to whether the due process clause applies, the majority completely ignores the point of the defendant's argument and reaches a flawed conclusion that is based on a distinction without a meaningful difference.

I also find it troubling that the majority's ill-conceived reasoning is not confined to this case, but extends to

any punitive damage award issued by an arbitrator no matter how large that award may be. Under its rationale, a \$50 million punitive damage award or even a \$5 billion award would not violate public policy and, therefore, would be immune from judicial review.[7] It does not

---

[7] This observation prompted the majority to write "that the astronomical awards envisaged by the dissent, although theoretically possible, are very unlikely . . . [and] [w]e ought not to make rules of law based on unrealistic hypotheses." Footnote 14 of the majority opinion. In response, I simply note that we need not look any further than this case to find an astronomical award because, in my view, a \$5 million punitive damage award in the absence of even nominal damages fits that bill. More importantly, the majority does not disagree that its reasoning would apply to a punitive damage award of any size, but merely suggests that we need not worry about the reach of its decision—a position that I believe is incompatible with a sound adjudicative process.

What I find even more alarming, and even more threatening to the state's policy of encouraging arbitration, however, is that there apparently is nothing in the majority's reasoning that would preclude it from applying to compensatory damage awards in arbitration proceedings. Thus, grossly excessive compensatory or punitive damage awards would not be subject to review by the courts under the majority's rationale. After today's decision, I wonder how any attorney could, in good conscience, expose his client to the risk of excessive damages by agreeing to an arbitration clause in a contract.

The majority responds to this concern by merely registering its disagreement with the notion that its "decision necessarily means that an excessive compensatory damage award will be unreviewable under the public policy exception." Footnote 15 of the majority opinion. In rendering that cursory response, the majority once again offers no principled basis for its disagreement with my observation, nor does it explain why its rationale also would not embrace excessive compensatory damage awards.

The majority nevertheless suggests that an excessive award might be reviewable by the courts on grounds set forth in § 52-418 and the case law interpreting that provision. See id. In particular, the majority notes that it "can conceive that there may be such a grossly excessive award that the court would be justified in vacating it on the basis of [an] arbitrators' evident partiality; see General Statutes § 52-418 (a) (2); or manifest disregard of the law." Footnote 15 of the majority opinion; see, e.g., *Garrity* v. *McCaskey*, supra, 223 Conn. 8–9. I do not believe that either of these grounds for vacating an arbitration award is sufficient to safeguard against the risk of excessive punitive damage awards by arbitrators. Although I acknowledge that a grossly excessive punitive damage award might be evidence of the arbitrator's partiality, the size of the award alone generally would not be sufficient to prove that "there has been evident partiality or corruption on the part of any arbitrator . . . ." General Statutes § 52-418 (a) (2).

take much foresight to predict that the majority's decision will cause parties to shun arbitration as a preferred method of dispute resolution because it will expose them to virtually unlimited punitive damage awards without any meaningful recourse from the courts.[8] I

With regard to the second ground cited by the majority, namely, an arbitrator's manifest disregard of the law, we have stated that, in order for a case to come within the reach of that doctrine, the defendant must show, inter alia, that "[t]he governing law alleged to have been ignored by the arbitrators [is] well defined, explicit, and clearly applicable." (Internal quotation marks omitted.) *Garrity* v. *McCaskey*, supra, 223 Conn. 9. In light of the majority's holding today, I cannot comprehend how that exception would apply in future cases of this nature. If the majority cannot find ample evidence of a well-defined and dominant public policy disfavoring excessive punitive damages awarded by an arbitration panel, then how could a defendant possibly establish that the arbitrator disregarded a "well defined, explicit, and clearly applicable" law limiting the amount of those awards? (Internal quotation marks omitted.) Id. Moreover, even if a defendant somehow could clear that hurdle, the exception would apply only in those cases in which the record reveals that an "arbitrator appreciate[d] the existence of a clearly governing legal principle but decide[d] to ignore or pay no attention to it." (Internal quotation marks omitted.) Id. For the foregoing reasons, I maintain that the public policy exception is the most viable path for the judicial review of grossly excessive punitive damages awarded in an arbitral forum because it offers certainty and consistency.

[8] The majority states that my prediction is "wholly speculative" because it assumes that parties will completely avoid arbitration and "does not consider the more likely alternative—that is, that parties who are concerned about such a result will, instead, opt to include in arbitration clauses language that either caps or precludes punitive damages altogether, or subjects an arbitral punitive [damage] award to judicial review." Footnote 14 of the majority opinion. Although I realize that predicting human behavior is not an exact science, it simply defies common sense to think that the majority's decision will not discourage parties from arbitrating their disputes, particularly when they realize that its rationale applies to excessive punitive damages *and* potentially to excessive compensatory damages. See footnote 7 of this opinion. I further believe that the scenario advanced by the majority is not entirely plausible because many parties will be unwilling to sign a clause that eliminates or limits punitive damages, particularly if they bear more risk from the venture than their counterparts. Indeed, when faced with such a provision, they may prefer to litigate in a court of law, where full remedies are available to them, or simply walk away from the contract.

I also note that contract provisions that eliminate or limit punitive damages would allow wrongdoers who engage in egregious misconduct to escape the appropriate punishment in situations that warrant a reasonable punitive

therefore submit that the majority opinion, in addition to violating the state's public policy disfavoring excessive punitive damages, also undermines the well established public policy favoring arbitration. Even the majority implicitly concedes that this latter policy is dominant, well-defined and expressly stated. See, e.g., *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, 272 Conn. 617, 626, 866 A.2d 582 (2005) ("we are mindful of the strong public policy favoring arbitration"); *New England Pipe Corp.* v. *Northeast Corridor Foundation*, 271 Conn. 329, 337, 857 A.2d 348 (2004) ("[a]rbitration is [a] favored [method of dispute resolution] because it is intended to avoid the formalities, delay, expense and vexation of ordinary litigation"

damage award beyond that authorized by the contract. Because statutory punitive damages are designed to protect the public interest, I do not believe that we should encourage private parties to contract them away.

With respect to arbitration clauses that provide for expanded judicial review of punitive damage awards, it is clear that General Statutes § 52-418 narrowly circumscribes the grounds on which courts may vacate an arbitration award, and I seriously question whether a party can expand them by contract. Cf. *Pina* v. *Pina*, 55 Conn. App. 42, 46, 737 A.2d 961 (1999) (parties cannot contract "to confer jurisdiction on a court [when] such jurisdiction is statutorily precluded"). Although § 52-418 is a state statute, it is relevant to note that federal courts are divided on that issue. Compare *Bowen* v. *Amoco Pipeline Co.*, 254 F.3d 925, 936–37 (10th Cir. 2001) (holding that parties may not contract to expand judicial review of arbitration awards beyond grounds authorized by Federal Arbitration Act and noting that Seventh and Eighth Circuit Courts of Appeals have suggested in dicta that "they too would reject contractually expanded standards") with *Lapine Technology Corp.* v. *Kyocera Corp.*, 130 F.3d 884, 889 (9th Cir. 1997) ("[f]ederal courts can expand their review of an arbitration award beyond the [Federal Arbitration Act's] grounds, when . . . the parties have so agreed") and *Gateway Technologies, Inc.* v. *MCI Telecommunications Corp.*, 64 F.3d 993, 996–97 (5th Cir. 1995) (parties' agreement to permit expanded judicial review of arbitration award by federal courts was "acceptable"). Moreover, even if it were clear that parties could contract for expanded judicial review of punitive damage awards, I do not understand how a court would conduct that review, if, as the majority concludes, the principles of *Gore* do not apply to the arbitral forum. For all of the foregoing reasons, I submit that it is the so-called "more likely alternative" advanced by the majority that is the "speculative" one. Footnote 14 of the majority opinion.

[internal quotation marks omitted]); *Stratford* v. *International Assn. of Firefighters, AFL-CIO, Local 998*, 248 Conn. 108, 127, 728 A.2d 1063 (1999) (Connecticut has "strong public policy favoring arbitration as an alternative method of dispute resolution"); see also *Garrity* v. *McCaskey*, supra, 223 Conn. 7; *Paranko* v. *State*, 200 Conn. 51, 56–57, 509 A.2d 508 (1986); *Bridgeport* v. *Bridgeport Local 1159*, 183 Conn. 102, 107, 438 A.2d 1171 (1981).

For all of the foregoing reasons, I would hold that Connecticut case law governing the award of punitive damages under the common law and CUTPA, together with the United States Supreme Court's decision in *Gore*, supports the conclusion that the state has a well-defined and dominant public policy against grossly excessive punitive damage awards. In order to determine whether a punitive damage award issued by an arbitration panel violates that policy, I would apply the three guideposts set forth in *Gore*, as further illuminated in *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003). In my view, such an approach would provide the courts with a principled and efficient method for identifying awards that exceed acceptable bounds, while respecting the substantial deference that we traditionally afford arbitrators' decisions. See, e.g., *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 134, 855 A.2d 964 (2004). I therefore turn my attention to an application of the three guideposts to the facts of the present case.

This case involves an ordinary contract dispute between two private parties. The defendant's misconduct implicated only economic harm and did not pose a risk to the health and safety of others. See *State Farm Mutual Automobile Ins. Co.* v. *Campbell*, supra, 538 U.S. 419 (in assessing reprehensibility of defendant's conduct, courts should consider whether "the harm

caused was physical as opposed to economic"). Furthermore, the fact that our legislature has limited punitive damages in product liability cases to twice the amount of compensatory damages awarded; see General Statutes § 52-240b; even though the conduct that forms the basis of the compensatory damage award in such cases often entails risk to the physical well-being of consumers, supports the conclusion that the award in this commercial dispute is grossly excessive.

With respect to the second guidepost, the ratio of punitive damages to compensatory damages, the United States Supreme Court has stated that there is no "bright-line ratio which a punitive damages award cannot exceed. . . . [I]n practice [however], few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mutual Automobile Ins. Co.* v. *Campbell,* supra, 538 U.S. 425. In the present case, it suffices to note that the ratio is infinite because the plaintiff could not prove to the arbitrators' satisfaction that it had suffered even nominal damages.

The third guidepost, which directs us to consider "the disparity between the punitive damages . . . and the civil penalties authorized or imposed in comparable cases"; (internal quotation marks omitted) id., 428; also supports the conclusion that the punitive damage award in the present case is grossly excessive. The maximum civil penalty authorized by the legislature for the defendant's CUTPA violation is $5000. See General Statutes § 42-110o (b). The $5 million punitive damage award issued against the defendant exceeds that amount by a factor of 1000. It also is nearly fifteen times greater than the highest award issued in a business dispute that did not entail an ongoing pattern of misconduct, that is, $340,000. See *Fabri* v. *United Technologies International, Inc.,* supra, 387 F.3d 126. In short, all three guideposts suggest that a $5 million punitive damage award

under the circumstances of this case is grossly excessive and, therefore, should be vacated.

Finally, it is relevant to note that other courts have applied the *Gore* guideposts even when the defendant does not claim that a punitive damage award violates his or her due process rights, but merely contends that it is excessive. See, e.g., *Lee* v. *Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (finding that *Gore* "should assist . . . in the application of [the] standard by which [a court] deem[s] excessive a punitive damage award that 'shocks [the] judicial conscience' "). In fact, courts have applied the principles of *Gore* within the specific context of an arbitration award. Of particular significance is *Sawtelle* v. *Waddell & Reed, Inc.*, supra, 304 App. Div. 2d 103, in which the Appellate Division of the Supreme Court of New York applied the guideposts to vacate a $25 million punitive damage award under CUTPA on the ground that the arbitration panel had manifestly disregarded the law. Id., 111–14. The court stated that "*Gore* is not only applicable to due process analysis of a punitive damage award but also provides a guide for determining whether such an award is irrational." Id., 110. Upon application of the guideposts, the court concluded that the award ran afoul of *Gore* because: (1) the defendant's conduct was not sufficiently egregious to warrant a $25 million punitive damage award; id., 111; (2) the "award dwarf[ed] the total compensatory damages by a factor of [twenty-three]"; id.; and (3) the amount of the award was "vastly out of proportion" to the civil penalties authorized by statute and the punitive damages awarded in comparable cases. Id., 112; cf. *Sanders* v. *Gardner*, 7 F. Sup. 2d 151, 176–79 (E.D.N.Y. 1998) (applying *Gore* guideposts, concluding that arbitrators had not manifestly disregarded law in awarding $10 million in punitive damages against securities broker-dealer, and noting that *Gore* and its progeny "help

illustrate the relevant analysis of excessiveness of punitive damages").

To summarize, I would conclude that Connecticut has a well-defined and dominant public policy against grossly excessive punitive damages. Because I believe that the award in the present case violates that policy and compromises the integrity of the arbitration process, I would remand the case to the trial court with direction to vacate the award. In light of that disposition, I would not reach the issue that the majority addresses in part II of its opinion, namely, whether the trial court improperly declined to award the plaintiff interest on the arbitration award.

Accordingly, I respectfully dissent.